DECISION
Before this Court for decision is the trespass and quiet title action of Peter and Janice Ludwig. The defendants (and counterclaim-plaintiffs), William and Martha O'Connell, have asserted ownership of the disputed land via adverse possession pursuant to G.L. 1956 § 34-7-1.
 FACTS AND TRAVEL
The Site of the Dispute
This land dispute revolves around the ownership and use of two lots located on Acacia Drive, Middletown, Rhode Island. Lot 171, purchased by Peter and Janice Ludwig (Ludwigs) in 1990, borders Green End Pond which is to the east. The closest lot to the west of Lot 171 is Lot 190. Lot 190 was purchased by William and Martha O'Connell (O'Connells) in 1993.
Acacia Drive was originally laid out by the developer as a "U" shaped street having two accesses to the connecting street, Bliss Mine Road. However, the "bottom" of the "U" which is closest to Green End Pond was never paved. Rather, through the years the owner of Lot 190 has apparently maintained a mowed lawn on this nearly level, 270' by 40' strip, incorporating the "paper street" into the lawn of Lot 190.[1] Acacia Drive thus appears to the eye as two dead end streets, Acacia Drive — north and south.
As related during her trial testimony, Martha O'Connell indicated that the paper street has been the site of parties, a kiddie pool, pony rides, volleyball games and softball games. The Ludwigs' property borders the eastern edge of the paper street. The O'Connells paid for a survey of the area; the resulting survey map was used as an exhibit at trial.[2] Without stated reason, the O'Connells have claimed by adverse possession a perfectly rectangular strip of the Ludwigs' lot which measures approximately 270' by 18'.[3] This rectangular area is referred to as "the disputed area." Central to this decision is what if any portion of the disputed area has passed to the O'Connells by means of adverse possession.[4]
The Beginnings
Peter Ludwig and his wife, Janice, formerly residents of Maine, decided to acquire real estate in Newport County, anticipating that their retirement years would be spent near to where Janice was raised as a child. In 1990, the Ludwigs acquired Lot 171 by warranty deed.[5] Lot 171 fronts on Green End Pond and at the time of the purchase, it was undeveloped. Over the years, Peter Ludwig visited and inspected his property, as well as cut brush. Mrs. Ludwig also regularly visited the property through the years. Their daughter, Heidi, camped on the property in the mid-1990's for a few weeks.
At some point the Ludwigs noticed that their neighbors, the O'Connells, were maintaining a mowed path to a stone bench located on the Ludwigs' property. The Ludwigs did not object to this temporary use of their land and neither the bench nor the mowed path gives rise to any claim made by the parties. According to the Ludwigs, they failed to notice any other encroachments onto their lot until around 1999, when they observed at least one garden near the north west corner of their lot. This garden was referred to as the north garden during trial and its general location is depicted on both Exhibits 3 and 11.[6]
During his visit to the property on March 25, 2000, Mr. Ludwig and a friend began to cut brush. He was almost immediately visited by an official from DEM.[7] The official advised Mr. Ludwig that he could not cut brush nor conduct other land altering activity without a permit. Later on that day, Mr. Ludwig was invited into the O'Connell home for coffee. The neighboring land owners had never previously met.
The O'Connells and Mr. Ludwig discussed the Ludwigs' future development plans. Mr. Ludwig testified that he told the O'Connells that once he started construction on his retirement home they would have to desist from using his land.[8] The O'Connells acknowledged having Mr. Ludwig in for coffee but dispute that there was any discussion that could be reasonably interpreted to require them to stop encroaching on the Ludwig property in the future. However, this Court finds significant that the O'Connells never again mowed a path to the concrete bench after the March 25 meeting. Nor did they know exactly where the boundary between the paper street and the Ludwigs' lot was located.[9]
While Peter Ludwig was having coffee inside the O'Connell's home, the DEM official returned. Mr. Ludwig apparently suspected that one of the O'Connells had called DEM again because he had failed to leave the neighborhood. In fact, Mrs. O'Connell testified that — although she did not know it at the time — her daughter had called DEM from another room in their home. This Court questions the veracity of that statement.
Key to this Court's findings was the testimony of Martha O'Connell. Mrs. O'Connell testified that in anticipation of moving to a new home on Acacia Drive in October 1993, she dug up certain perennials which she had previously planted at her then rented home. She then took a bag of perennial roots to the site of the home which she and her husband, William, were in the process of buying on Acacia Drive. Mrs. O'Connell then planted some of these in an area of what would later become the "Secret Garden," located near the southern end of disputed area of Lot 171. Clearly, the plants placed in the ground at that time were not obvious. Joan Gamble, a witness who is friendly with the O'Connells, testified that she visited the premises in 1993 and was shown about by Martha O'Connell. Gamble testified that Mrs. O'Connell spoke in terms of the future location of gardens, not existing plantings. Although she received a Gardener's Diary for Christmas in 1993,[10] there is no notation of planting in the north (East Border) garden until April 9, 1995. The Secret Garden is not referred to in the diary until March 1, 2000.
Although not specified with any precision or measurement, Mrs. O'Connell testified that the Secret Garden has been expanded over the years. Exhibits B and C which are photographs were admitted to reflect the appearance of the Secret Garden site. However, Mrs. O'Connell could not establish when the photograph marked "B" was taken. A printed date line which appears on the reverse side of "B," obviously associated with the film development process, indicates that the photograph was developed on May 4, 2001. Spring flowers are evidenced by the photograph. Mrs. O'Connell testified that the photograph marked "C" was taken in 1999. That testimony probably represents nothing more than her observation of her husband's printing of numeric figures on the photograph's reverse side which reflects a date of "9/99."
Martha O'Connell likewise testified that in October 1993, she planted perennial roots in the area now referred to as the north garden. She stated, "It was not extensive. I spaded up some dirt, plopped the roots in, covered them up, and that was it." Later that fall, after she and her family moved into the home at 7 Acacia Drive, she also planted spring bulbs at unspecified locations. Mrs. O'Connell testified that over time she bought many bulbs and plants and created or enlarged gardens throughout the property. Her recollection at trial was that she did not plant any additional perennials in the Secret Garden or the north garden during the following year. Rather, in 1994, she apparently was involved in planting or revitalizing gardens located elsewhere on her property.
Importantly, Mrs. O'Connell identified a photograph (Exhibit E) as showing the appearance of the north garden in April 1994. Again the date of the photograph was apparently supplied by her husband.[11] The photograph shows a smallish, irregular oval shaped garden surrounded by a cobblestone border in which spring flowers, including daffodils, are blooming. Martha likewise identified another photograph[12] of the north garden as it allegedly appeared in December 1995. Although dahlias (a late summer/fall flower) are growing in the area depicted, no cobblestone border to the garden is visible. As shown in this photograph (Exhibit F), the overall garden space appears smaller than the garden area depicted in the photograph which the O'Connells claim was taken 18 months earlier. Nor does the garden shown in Exhibit F appear to have an oval shape.
The O'Connells' Use of the Disputed Area
Martha O'Connell testified that as early as 1993 she was advised by her husband that her plantings might be on someone else's property. However, she justified the location of the plantings by: (1) assuming that no one would ever be able to build on the over one acre, water front lot, and (2) the soil was good there. In her own words, Mrs. O'Connell testified, "I saw no problem with this." Exactly where the Secret Garden and the north garden were located in 1994 is unclear to the Court. What is certain is that the gardens as they appeared in the late 1990's and today are far bigger than in 1994 or 1995. As Mrs. O'Connell testified, "[e]very year I would expand them."[13] When pressed as to the size of the original north garden she indicated about half or 60% of its current size. She likewise graphically illustrated her estimates by placing lines on the 2004 survey map. Exhibit 11. On that drawing, Martha drew lines which depict the growth of the north garden over time. According to her, approximately a third of the current garden was planted in 1993.[14] By 1995, the garden had expanded to the west, and by the year 2000, she maintains that it achieved its current size.
During his testimony, William O'Connell indicated that he varied his mowing pattern in the disputed area because he, "believe[d] in 1995 or '96 my wife created a garden which extended to the west (sic) of what I had been mowing . . . so my mow line had to change." Although not explicitly stated, he apparently was referring to the creation, formalization, or expansion of the Secret Garden.
William O'Connell also testified that the gardening activity in the disputed area increased after March 25, 2000. Thus, at the time this litigation was commenced, the gardens were, by the defendants' own testimony, increased in size over time. Exactly when the north garden was established is hotly contested. Not only did the Ludwigs testify that they never observed gardens in the disputed area until around 1999, but long time neighbor Rosemary Day testified that she is familiar with the location of the paper street and its boundary with the lot now owned by the Ludwigs. Day testified that she did not notice a garden (in the disputed area) until 2002 or 2003. "I'm sure that it wasn't there in 1994 or for several years later."
The Secret Garden has apparently likewise been enlarged over time. No details of this were provided by the evidence. Clearly, a photograph of a tent located near that garden, allegedly taken in the year 2000,[15] does little to establish the O'Connells' claim of title by adverse possession.
The O'Connells likewise mowed the grass in the disputed area. Mrs. O'Connell testified that the mow line — an abrupt change in the vegetation appearance from closely mowed grass to higher grass to the east (and further on to the Ludwig property) — has been in the same location since their purchase of Lot 190. The mow line is labeled "edge of lawn" on Exhibits 3 and 11.[16] Attorney Peter Regan, a neighbor who has walked his dog in the vicinity of the O'Connell and Ludwig properties, testified that the mow line was moved to the east sometime after the O'Connells began their occupancy. Attorney Regan believed that the line was moved in an easterly direction in the fall of 1993 or in 1994.
However, the testimony of the Ludwigs' daughter, Heidi Heilman, indicated substantial movement of the mow line after the O'Connells moved in. Ms. Heilman testified that for three weeks in the summer of 1994, she camped on her parents' property in a tent. Heilman recalls clearing a path to the tent site near the water's edge. She testified that there was no north garden at the time. Upon revisiting the property in 2003, she was surprised at how far the mow line had been moved in an easterly direction. According to Heilman's recollection, the mow line was very close to the paper street in 1994, the location of which she identified by a dashed line on Exhibit 3.
William O'Connell testified that he began mowing the lawn in late 1993, but that the mow line "was later a little adjusted." Another witness and neighbor called by the O'Connells, Jeffery Heibner, testified that he observed the O'Connells maintaining property in the vicinity of the disputed area. However, when pressed on cross examination, he could not be sure whether or not the gardens and mow line were east of the paper street.
Both Martha O'Connell and her husband, William, testified as to other activities for which they used the disputed area. They testified concerning the storage of wood, composting, birdhouses, volleyball games,[17] the use of a hammock,[18] party tents,[19] a play set,[20] occasional softball games,[21] a kiddie pool, and a portable composter that involved use of not only the paper street but portions of the disputed area. This Court finds that the evidence is less than clear and convincing as to most of these uses. The photographs submitted and the related testimony established that for the most part, these activities occurred on the paper street. An exception is a wood pile, some of which remained on the disputed area for some time. Likewise, a composter was apparently on the disputed area at various locations for many years. However, this Court cannot find convincing evidentiary support to find that either of these two uses was carried on for a ten year period.[22]
Battle Lines Are Drawn
In 2003, the Ludwigs began actively attempting to develop their property. In conversations with a potential lender, Peter Ludwig was advised that there may be a cloud on his title because of claims made by the O'Connells. Hearings before town regulatory authorities brought the parties together, and not amicably. At times when the Ludwigs attempted to drive onto Lot 171, the O'Connells would block access with a lawn mower or vehicles. The police were called repeatedly.[23] Stakes placed in the ground by Peter Ludwig, family members, or surveyors were pulled out and thrown further onto the Ludwigs' lot. At least some of this was done by William O'Connell who was caught "red handed" by Mr. Ludwig and his son-in-law who recorded the event on infrared video equipment.[24] The O'Connells responded by placing a "no trespassing" sign in the disputed area.
In July 2004, the Ludwigs' attorney notified William O'Connell that he should immediately cease entry into the Ludwigs' property.[25] In October 2004, the Ludwigs filed a Notice of Intent to Dispute Adverse Possession with the town. On December 29, 2004, the Ludwigs brought the first of these related lawsuits against the O'Connells, seeking to quiet title and further relief from claimed trespass.
The O'Connells not only answered the Ludwigs' complaint but filed a counterclaim seeking title to the disputed area by adverse possession. Moreover, because of continued friction between the litigants, William O'Connell (originally pro se), on behalf of himself and his wife, filed for a restraining order which, had it been granted, would have prevented the Ludwigs from having access to Lot 171 by means of the disputed area. The plans for the Ludwigs' home require that a portion of the land now termed the disputed area be utilized for the home's driveway.
Having heard testimony and received exhibits during a four day trial, the case is now ripe for decision.
 LEGAL ANALYSIS
The O'Connells' Adverse Possession Claim
In order to succeed on a claim of adverse possession pursuant to G.L. 1956 § 34-7-1, "`a claimant's possession must be `actual, open, notorious, hostile, under a claim of right, continuous, and exclusive' for at least ten years.'" Acampora v. Pearson,
___ A.2d ___, 2006 R.I. LEXIS 96, at *18-19 (R.I. June 6, 2006) (quoting Travares v. Beck, 814 A.2d 346, 350 (R.I. 2003)). A successful claim of adverse possession requires strict proof or proof by clear and convincing evidence of each of the elements.Id. at *19. Because this Court finds that the O'Connells did not establish by strict proof that the gardens at issue existed for the requisite ten-year period, the O'Connell's claim must rest principally on the development of a lawn to the west of the "mow line" now located on the Ludwigs' property.
"To establish adverse possession, claimants must show that their use of the land was sufficiently open and notorious to put a reasonable property owner on notice of their hostile claim."Travares, 814 A.2d at 352; see also Walsh v. Cappuccio,602 A.2d 927, 930 (R.I. 1992) ("`[C]ontinuity of the possession must be sufficient to signal the true owner of the land that a claim contrary to his own is being asserted.'"). Although our Supreme Court has not specifically held that a mow line in and of itself is sufficient to establish a claim of adverse possession, this Court assumes that the establishment of a closely mowed lawn to a clearly defined mow line is sufficient use of the property for purposes of adverse possession. See Norton v. Courtemanche,798 A.2d 925, 934 n. 3 (R.I. 2002) (declining to decide whether a cut-grass line alone can establish a boundary for purposes of adverse possession). However, this Court finds that the evidence failed to clearly and convincingly establish that the mow line extended onto the Ludwigs' property continuously for ten years.
While Martha O'Connell testified that the mow line had not changed since her joint purchase of Lot 190, William O'Connell testified that he extended the mow line beyond the flowers sometime in the Fall of 1994. Obviously, as confirmed by the testimony of Martha O'Connell, the gardens were not planted in or on the existing lawn. Thus, the mow line, which at one place now extends approximately eighteen feet onto the Ludwig property, must have been many feet to the west prior to the initial garden plantings. Moreover, contrary to the O'Connells' testimony, the Ludwigs' daughter testified that in 1994 the mow line ran along the paper street, essentially along the Ludwig property line. She further related that she was shocked by the dramatic relocation of the mow line when she observed it again in 2003. Adding more uncertainty to the actual location of the mow line is this Court's finding that the gardens, around which William O'Connell claimed to have mowed, were not substantially and openly developed until after 1995. Moreover, the testimony revealed that the gardens had expanded as much as one hundred percent throughout the years. Thus, it is impossible to find where in the disputed area the lawn may have extended at the beginning of any ten year period. The evidence as to the location of the mow line in this case lacks sufficient definition to support a finding of adverse possession. See Norton, 798 A.2d at 933 ("[T]he grass line . . . was insufficiently definite in location and in the period of existence to support [a] claim of adverse possession.").
Concerning the alleged recreational activities, including the volleyball and softball games, hammock use, parties, kiddie pool and child's play set, the photographic evidence indicated that these activities took place either primarily or exclusively on the paper street. These recreational activities did not occur on the Ludwig property openly and continuously for the requisite ten-year period. Similarly, the evidence did not clearly and convincingly demonstrate that either a recognizable wood pile or the composter existed on the Ludwig property for a ten-year period. Thus, due to the lack of strict proof of each and every element of adverse possession, the O'Connells' claim must fail. As a result, title to the disputed area remains with the Ludwigs.
Ludwigs' Claims for Quiet Title and Trespass
This litigation was commenced by the Ludwigs' claims for quiet title and trespass by the O'Connells. The claim for quiet title pursuant to G.L. 1956 § 34-16-4 is essentially the mirror image of the O'Connells' claim for title of the disputed area by adverse possession. The O'Connells' claim must be denied for the want of clear and convincing evidence. Accordingly, the judgment in these consolidated actions shall reflect that the Ludwigs' claim for quiet title is granted as to Lot 171 in its entirety.
The Ludwigs have likewise sought injunctive relief and damages for the O'Connells trespass on to Lot 171. Trespass occurs when a person "intentionally and without consent or privilege enters another's property." Ferreira v. Strack, 652 A.2d 965, 969
(R.I. 1995) (Citations omitted.) Of course, it is part of the Ludwigs' defense to the O'Connells' adverse possession claim that they permitted the O'Connells to use part of Lot 171 until the Ludwigs began building their retirement home. Thus, any encroachment by the O'Connells prior to 2003 could not be a trespass.
At some point starting in 2004, William O'Connell repeatedly pulled stakes out of the ground in the vicinity of the disputed area. Those stakes had been placed in the ground by Peter Ludwig or workmen who he had employed to mark the lot in preparation for building a house. William O'Connell testified that he believed that he and his wife then owned the disputed area by reason of adverse possession. It was not until the July 19, 2004 letter[26] sent by one of the Ludwigs' attorneys that the Ludwigs made a written record of their claim of trespass by the O'Connells. Lot 171 was staked several times. As recently as December 10, 2005 when William O'Connell was recorded by infrared camera,[27] he removed stakes from the ground and threw them further on to Lot 171, that is, away from the paper street. On this occasion Mr. O'Connell may have walked as much as 80 feet on to Lot 171. Walking a substantial distance onto the Ludwigs' land on December 10, 2005 could be considered a trespass given the notice provided by the July 19, 2004 letter. However, this Court does not find it offensive that on one occasion, at night, William O'Connell approached the source of a red light which was apparently part of the infrared camera being utilized to record his activity. Natural curiosity and an instinct to defend his family and property may have been the motivation behind his investigation which resulted in his discovery of Peter Ludwig and his son-in-law using sophisticated camera equipment.
The Ludwigs have not seriously pressed their trespass claim in their post trial brief. Moreover, at trial there was no focused attempt to prove damages as a result of any alleged trespass by the O'Connells. Damages were not proved. Accordingly, the Court finds for the O'Connells as to the claim of trespass made against them.
 CONCLUSION
For the reasons stated above, this Court finds that the Ludwigs' claim for quiet title as to their ownership in fee of Lot 171 should be granted. The O'Connells' adverse possession claim of title to the "disputed area," so-called, was not proved. The Ludwigs' claim against the O'Connells for trespass has not been proved.
Counsel shall prepare a judgment for entry.
[1] See Exhibit 1.
[2] Exhibit 3 and 11 were originally identical. Exhibit 11 was used and marked on at the deposition of Martha O'Connell. Exhibit 3 was used extensively at trial. Numerous witnesses placed markings on Exhibit 3 during their testimony.
[3] Determining the exact claim of the O'Connells is difficult. During her testimony, Mrs. O'Connell conceded that the mow line did not extend 18 feet onto the Ludwig property. That is consistent with the survey.
[4] As suggested above, neither the Ludwigs nor any neighbor has contested the O'Connells' decision to augment their lawn (and use for a variety of purposes) the entirety of the paper street, an area of nearly 11,000 square feet. The adverse possession claim made in this dispute relates solely to the O'Connells' claim for more.
[5] See Exhibit 2.
[6] The garden is labeled "East Border G" on Exhibit 11, the survey map used during the deposition of Martha O'Connell.
[7] This is an acronym referring to the Rhode Island Department of Environmental Management.
[8] Mr. Ludwig recalls telling the O'Connells that, "We recognize your gardening use of our land and don't object to it, but when we come down to build that of course would have to stop."
[9] See testimony of William O'Connell.
[10] See Exhibit D.
[11] There was no objection to the admission of the photograph or the obvious absence of any proper foundation.
[12] Similarly, there was no objection to photograph marked Exhibit F despite the lack of a reliable foundation for its admission. The accompanying text should suggest to plaintiff's counsel sound reasons for observing the rules of evidence.
[13] As of trial, Martha indicated that the north garden measured approximately 20' by 10' in the shape of an oval.
[14] The only plantings in 1993 were roots and bulbs buried into the soil. During Mrs. O'Connell's testimony, two photographs (the so-called "fox photos") were admitted. They depict the east lawn area of the O'Connells' home, the paper street, and the disputed area to the mow line and beyond. Based upon the O'Connells' testimony and the survey map prepared at their direction (Exhibits 3 and 11), the north garden should also be seen. It is not. Nor is the wood pile, the play area, a composter or any other item identified as the O'Connells as being regularly located in the disputed area for over ten years. The "fox" photographs were admitted over an objection which was never pressed or explained.
[15] The film processing marks on the reverse of the photograph indicates that the photograph was developed in 2001.
[16] These exhibits were identical in their original form. Exhibit 11 was used during the deposition of Martha O'Connell on June 1, 2005. During her deposition she apparently made markings on the survey map, some of which are referred to herein.
[17] At trial Mrs. O'Connell testified that Exhibit 9, the photograph of the volleyball net, showed that it was located on the paper street.
[18] Mrs. O'Connell testified that the hammock was north of the play area as depicted on Exhibits 3 and 11. Despite her assertion that this was "in the disputed area," the Court finds that the hammock would have been in the paper street.
[19] At trial Mrs. O'Connell conceded that Exhibit 10, the picture of the party tent, showed that most of it was on the paper street. "I believe that the back poles would have been on the disputed territory."
[20] In their amended counterclaim, the O'Connells alleged that the play/swing set was located in the "disputed area." At trial Mrs. O'Connell testified that it was on the paper street and "not in the disputed area."
[21] The photograph of the softball game, Exhibit 12, was taken in 2003. Obviously, it has limited relevance regarding an adverse possession claim.
[22] According to Martha O'Connell, the fire wood was delivered in 1993 or 1994 and (at least some of it) remained for years. She testified that there remains "traces." This appears to be in conflict with the testimony of William O'Connell who testified that the wood was stored in the disputed area for ten years. The composter was moved around to various locations. The origin of its use was not explained. It is likewise unclear when the birdhouse(s) came to be located in the disputed area.
[23] See Exhibits 4, 5, and 6.
[24] See Exhibit 8.
[25] See Exhibit 7.
[26] See Exhibit 7.
[27] See Exhibit 8.