Lawrence P. TAVARES et al.

v.

Horace P. BECK.

No. 2001–541–Appeal.

Supreme Court of Rhode Island.

Jan. 29, 2003.

Kenneth R. Tremblay, Portsmouth, for Plaintiff.

Maryjo Carr, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

In these two consolidated nonjury cases, a Superior Court trial justice found insufficient evidence to establish adverse possession. He then entered judgment in favor of the defendant, Horace P. Beck (Beck), the record-title holder of three adjacent parcels of mostly undeveloped property located on the Little Compton–Tiverton border (the property). The plaintiffs, Lawrence P. Tavares and Edna M. Tavares (the Tavareses or claimants), who are the adverse possessors manqué, appeal from this judgment.

We conclude that the trial justice misconstrued the claim-of-right doctrine when he ruled that the Tavareses and their predecessors failed to satisfy the elements of adverse possession. We also are of the opinion that the trial court should not have weighed the record-title holder's out-of-state residence as a factor in deciding that the claimants failed to meet the strict standard of proof required in such cases. Finally, we respectfully disagree with the trial justice's determination that a predecessor of the claimants had engaged in inequitable conduct by attempting to "bootstrap" himself into owning the property after he discovered that he did not hold record title. Consequently, we vacate the judgment and remand for further proceedings consistent with this opinion.

### Facts and Travel

Located in Tiverton, the property bordered on the Little Compton town line to the south, and by the south edge of the old cart path to the north. In 1991, Lawrence P. Tavares purchased two of the parcels in question from James Amarantes (Amarantes), who obtained his title in 1977 from Robert S. Almy, Rudolph W. Almy, and Elizabeth Lincoln (collectively, the Almys). Two years later, the Tavareses acquired the third parcel—situated between the other two—from Amarantes. The Tavareses sought to remove any cloud on their title by having the court declare that they were the rightful owners of the property. They also asserted that they and their predecessors had been in "open, adverse, exclusive and uninterrupted possession and enjoyment" of the property for more than seventy years. The court consolidated the two cases for a nonjury trial.

After hearing the evidence, the trial justice concluded in a bench decision that the

Tavareses had failed to satisfy their heavy burden of proof to establish adverse possession. He ruled that they had not possessed the property for the requisite ten-year period and that they could not tack on the previous period of Amarantes's occupation because his use of the property was neither under claim of right nor hostile to the true owner. The trial justice found that Amarantes's activities on the parcels—including the posting of no-trespassing signs, digging drainage holes, and building a stone wall—were not visible from any street or lot line. Further, the trial justice concluded that Amarantes, "knowing that he did not have record title to the disputed land, undertook a course of conduct designed to bootstrap himself into ownership, including deeding the property that he knew he did not own to himself and his wife and later to plaintiff." Because the lawsuit was an equitable action, the trial justice reasoned, the Tavareses could not rely on a predecessor in title such as Amarantes, whose "hands"—in the trial justice's estimation—were "hardly clean." He reached this conclusion because, after Amarantes surveyed the land between 1978–79, he realized that the property he had purchased from the Almys did not include the disputed parcels, yet he still continued to use and possess the property as if he owned it. And—what was even worse in the eyes of the trial justice— Amarantes ultimately took steps to deed the property to himself and his wife to make it seem as if he and his wife were the true owners of record.[1]

A single justice of this Court ordered the parties to show cause why we should not decide the appeal summarily. After reviewing the parties' legal memoranda and considering their oral arguments, we conclude that they have not done so and proceed to decide the appeal at this time. On appeal, the Tavareses argue that the trial justice erred in finding that Amarantes's use of the property was not under a claim of right, was not hostile, and was not open and notorious. They also assert that he erred in finding that the posted signs and the stone wall would not have been visible from the street. In addition, they contend, the trial justice erred in finding that the Tavareses's predecessor in title, Amarantes, did not have "clean hands" concerning the parcels in question. Finally, they maintain that the trial justice erred in not allowing Amarantes to testify about what Rudolph Almy told him about the location of the property line, and in excluding an affidavit that Robert Almy signed and provided to Amarantes.

## Analysis

General Laws 1956 § 34–7–1 addresses adverse-possession claims. Section 34–7–1 provides as follows:

"Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, *claiming the same as his, her or their proper, sole and rightful estate in fee simple,* the actual seisin and possession shall be allowed to give and make a good

---

1. Although it was not mentioned by the trial justice or by the parties in their briefs to this Court, it appears that in 1991 Amarantes may have subdivided the property in question from the rest of the land he owned in this area without obtaining approval from the town to do so. Nevertheless, because this issue was not raised, we do not determine whether Amarantes was required to obtain any such approval, nor if he was, whether this circumstance should have been considered in evaluating the Tavareses's adverse-possession claim.

and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action." (Emphasis added.)

▮ This Court has long held that to establish adverse possession, a claimant's possession must be "actual, open, notorious, hostile, under claim of right, continuous, and exclusive" for at least ten years. *Sherman v. Goloskie*, 95 R.I. 457, 465, 188 A.2d 79, 83 (1963); *see also Norton v. Courtemanche*, 798 A.2d 925, 931 (R.I. 2002) (per curiam); *Carnevale v. Dupee*, 783 A.2d 404, 409 (R.I.2001); *Taffinder v. Thomas*, 119 R.I. 545, 551, 381 A.2d 519, 522 (1977). The party claiming adverse possession must establish each of these elements by "strict proof, that is, proof by clear and convincing evidence." *Carnevale*, 783 A.2d at 409 (quoting *Anthony v. Searle*, 681 A.2d 892, 897 (R.I.1996)).

As the parties concede, the Tavareses's time of possession fell short of the statutory ten-year period. Therefore, to prevail, they had to "tack on the period of possession of [their] predecessor from whom [they] derived title." *Carnevale*, 783 A.2d at 412 (quoting *Taffinder*, 119 R.I. at 549, 381 A.2d at 521). The question presented here is whether the Tavareses established by clear and convincing evidence that their predecessor, Amarantes, had satisfied all the elements of an adverse-possession claim when he purportedly possessed and used the parcels in a manner adverse to the owner of record.

▮ The findings of fact of a trial justice sitting without a jury are entitled to great weight and will not be disturbed by this Court absent proof that they are clearly wrong or that the trial justice overlooked or misconceived material evidence. *Carnevale*, 783 A.2d at 408; see *also Vargas Manufacturing Co. v. Friedman*, 661 A.2d 48, 53 (R.I.1995). Here, many of the points raised on appeal are challenges to the trial justice's factual findings concerning the nature and extent of Amarantes's possession and use of the disputed parcels. Nevertheless, because the trial justice misconstrued the claim-of-right element for establishing an adverse-possession case, because he improperly considered Beck's status as an absentee owner when he evaluated whether Amarantes's use of the property was sufficiently open and notorious, and because he incorrectly considered Amarantes's knowledge that he lacked colorable legal title to the property as evidence of his supposed "unclean hands," we are constrained to vacate the judgment and remand for a new decision and judgment consistent with this opinion.

## I

### Claim of Right and Hostility

The trial justice ruled that plaintiffs failed to establish that their predecessor in interest, Amarantes, held the parcels in question under a claim of right, citing Amarantes's admitted discovery via a 1978–79 survey that the parcels were not a part of the property he had acquired from the Almys. The trial justice determined that, as a result of this discovery, Amarantes was on notice that he did not hold title to the parcels in question, and therefore he could not possess the parcels under a claim of right. He stated that "[t]his court is not aware of any authority that allows someone who knows he does not own land to occupy it and divest the true owner of his interest." Indeed, the trial

justice believed that Amarantes thereafter embarked upon "a course of conduct designed to bootstrap himself into ownership." Thus, based on these findings, the trial justice ruled that Amarantes's use of the property after the 1978–79 survey was neither under a claim of right nor sufficiently open and notorious, and therefore did not satisfy the statutory requirements for adverse possession.

 Contrary to the trial justice's belief, however, a person attempting to obtain title through adverse possession "need not be under a good faith mistake that he or she had legal title to the land." 16 *Powell on Real Property*, § 91.05[1] at 91–23 (2000). Rather, to constitute a hostile use, the adverse possessor need only establish a use " 'inconsistent with the right of the owner, without permission asked or given, * * * such as would entitle the owner to a cause of action against the intruder [for trespass].' " *Id.* Similarly, a good faith mistake concerning who owns the land in question is not required to establish a claim of right to a disputed parcel:

> "Possession under a claim of right means that the entry by the claimant must be in accordance with a claim to the property as the claimant's own with the intent to hold it for the entire statutory period without interruption. This intention must be demonstrated by open, visible acts or by declarations regarding such purpose. * * * In essence, to require adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner. Unfortunately, claim of right is sometimes confused with color of title * * *, which requires possession in accordance with a colorable legal title to

the property." *Id.* § 91.05[4] at 91–28, 91–29.

Thus, a claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner. *See, e.g., Picerne v. Sylvestre*, 122 R.I. 85, 91–92, 404 A.2d 476, 479–80 (1979). In other words, "a claim of right to own or use property will arise by implication through objective acts of ownership that are adverse to the true owner's rights, one of which is to exclude or to prevent such use." *Reitsma v. Pascoag Reservoir & Dam, LLC*, 774 A.2d 826, 832 (R.I.2001); *see also Carnevale*, 783 A.2d at 412 (distinguishing "claim of right" from "color of title"). Thus, in establishing hostility and possession under a claim of right, the pertinent inquiry centers on the claimants' objective manifestations of adverse use rather than on the claimants' knowledge that they lacked colorable legal title. *See* 5 Restatement of the Law *Property* § 458, comment *d* at 2927 (1944); 3 Am. Jur.2d *Adverse Possession*, § 45 (2002). Accordingly, even when claimants know that they are nothing more than blackhearted trespassers, they can still adversely possess the property in question under a claim of right to do so if they use it openly, notoriously, and in a manner that is adverse to the true owner's rights for the requisite ten-year period.

 Here, the trial justice improperly factored into his claim-of-right analysis Amarantes's subjective knowledge as of 1978 that he lacked colorable legal title to the parcels. As noted above, however, a claim of right to own or use property does not arise from the claimants' mistaken belief that they hold title to the land, but rather from their objective acts of ownership evidencing an intent to use and possess the premises in a manner adverse to

the owner of record. This remains true even in a situation in which the claimants know that they do not hold record title to the property in question but still engage in a calculated attempt to deprive the record owner of the title through actions and uses that, if continued for the requisite period, will ripen into adverse possession. In short, "it is not necessary in order that a use be adverse that it be made either in the belief or under a claim that it is legally justified." 5 Restatement of the Law *Property* § 458, comment *d* at 2927.

Here, the trial justice noted that Amarantes undertook such activities on the property as posting no-trespass signs, constructing stone walls, improving drainage, and wood cutting. Irrespective of Amarantes's knowledge that he was not the title holder, these objective manifestations of Amarantes's claim of ownership should have been evaluated by the trial justice to determine whether they were sufficiently open and notorious to constitute adverse uses of the property, thereby establishing a claim of right. Because he did not do so, we vacate the judgment and remand the case for further findings and the entry of an amended judgment.

## II

### Open and Notorious

For adverse possession to occur, the use to which the land is put must be similar to that which would ordinarily be made by owners of similarly situated real estate. *See Sherman*, 95 R.I. at 466, 188 A.2d at 84. When the property under consideration is "wild land or remote, unimproved rural land," this Court has said that "actual occupation or intensified use thereof" may not be necessary to establish adverse possession of the subject property. *Id.* Rather, it is sufficient that "the use to which the land has been put is similar to that which would be made ordinarily of

like land by the owners thereof," *id.*, considering the "character and locality [of the subject land], and the uses and purposes for which it is naturally adapted." *Id.* (quoting *Goen v. Sansbury*, 219 Md. 289, 149 A.2d 17, 22 (1959)). Once the claimants go on to the land and use it openly and adversely to the owner of record title, the latter becomes chargeable with knowledge of what has been done openly on the land. *Anthony*, 681 A.2d at 897–98 (citing *Gammons v. Caswell*, 447 A.2d 361, 367 (R.I.1982)).

Thus, to establish adverse possession, claimants must show that their use of the land was sufficiently open and notorious to put a reasonable property owner on notice of their hostile claim. *Id.* No particular act or acts on the part of the claimant is required to put the world on notice of the adverse claim—"[i]t is sufficient for the claimant to go upon the disputed land and use it adversely to the true owner. The owner then becomes chargeable with knowledge of whatever occurs on the land in an open manner." *Lee v. Raymond*, 456 A.2d 1179, 1183 (R.I.1983). To be sure, "[o]ur adverse-possession statute was never intended to allow the possessor of property to mask his intent and then acquire the property by concealing the true situation from the record owner." *Picerne*, 122 R.I. at 91–92, 404 A.2d at 479–80. But the fact that the record owner resided out of state and apparently failed to visit the property was irrelevant. Here, Beck was living in Vermont during most of this period and, thus, was not physically present to observe Amarantes's activities on his property. Nevertheless, he was still chargeable with knowing whatever was done openly on the land he owned—whether or not it could be observed from the road or from the boundary of the property.

Here, the trial justice found that, given the mostly undeveloped nature of the land in question, the lack of visibility of the land-use activities that Amarantes described from any street or lot line, and the physical absence of the record owner from the area, Amarantes's possession and his use of this land were not sufficiently open and notorious, thus falling short of adverse possession under the statute. The trial justice made the following findings:

"The subject land is wooded, swampy and underdeveloped. The drainage improvements done by Amarantes, the signs posted, the alteration arising with respect to the stone walls and other acts would not have been visible from any street or the lot line. Furthermore, it would be unreasonable to expect the defendant, who was living in Vermont, [to] have any knowledge of such activity."

This finding, however, was partially premised on the trial justice's erroneous belief that Beck's residence in Vermont was a factor to be considered in deciding what quantum and intensity of use would be necessary to establish adverse possession—when, as a matter of law, this circumstance was an irrelevant consideration. Here, regardless of where Beck was living, he was chargeable with knowing what open uses were being made of his property during the ten-year period in question. *See Anthony*, 681 A.2d at 897–98. Thus, the trial court's consideration of defendant's out-of-state residency in its findings was improper.

In addition, plaintiffs have challenged the trial justice's finding that Amarantes's improvements—namely, the stone wall he constructed, the drainage work he under-took, and the no-trespassing signs he posted—were not visible from South Lake Road, the nearest improved roadway to the subject property. They suggest that the trial justice also overlooked the uncontradicted testimony of Amarantes that the stone wall and at least one no-trespassing sign were visible from South Lake Road. At trial, Amarantes testified that, before conducting the 1978–79 property survey, he personally constructed a stone wall on the subject land, commencing at the westerly edge of the cart path and South Lake Road, and continuing "about a hundred and fifty feet to where the road led from the cart path into the property." Amarantes further described this stone wall as "[p]robably two feet wide, twelve and a half feet high," and he further testified that this wall was visible from South Lake Road. In addition, Amarantes testified that as early as 1977 he had printed and then posted on the property cardboard signs stating "[N]o trespassing. Property of James Amarantes."[2] Amarantes also testified at trial that at least one of these signs was visible from South Lake Road. Amarantes's testimony in this regard was not impeached on cross-examination. And because Beck presented no witnesses at the trial, Amarantes's testimony about the visibility of the wall and the sign from South Lake Road was uncontradicted at trial. In light of this uncontradicted testimony, and in the absence of any rejection by the trial justice of Amarantes's testimony or a finding that his testimony in this respect was incredible, we hold that the trial justice misconceived and overlooked material evidence in finding that none of the improvements in question were visible from the nearest road or boundary line.

2. Amarantes further testified that although these cardboard signs only lasted for a few years (they eventually fell victim to water damage), he then replaced them with plastic signs containing the same printed information. Although Amarantes could not recall the exact language on these plastic signs, he testified that they were no-trespassing signs, and that they included his name and telephone number.

Moreover, even though the visibility of the adverse uses from any street or lot line may be considered in determining whether the uses in question were sufficiently open and notorious to put the owner of record on constructive notice of same, it is not essential for an adverse claimant to show that the uses in question were observable from the nearest improved road or lot line to establish these elements of adverse possession. Rather, the proper inquiry is whether Amarantes used the property in a manner consistent with how other owners of rural, undeveloped woodlands typically would use such land, and whether these uses took place in a manner "calculated to attract attention," thus placing the world on constructive notice of his adverse claim. *Sherman,* 95 R.I. at 466, 188 A.2d at 84 (quoting *Marvel v. Barley Mill Road Homes, Inc.,* 104 A.2d 908, 911 (Del.Ch. 1954)). Thus, for example, if someone were to build a home in the middle of a large, wooded lot and then live there for ten years or more, the record owner will not be heard to say that such a use was not sufficiently open and notorious to constitute adverse possession merely because the house was not visible from the nearest improved road or lot line.

Finally, we note that Amarantes's uncontradicted testimony was that he constructed a twelve-foot-high stone wall on the subject property. This act alone—if combined with maintenance of the wall over a ten-year period—may be sufficient to prove adverse possession of the land in question as a matter of law. In *Reitsma,* 774 A.2d at 835, we held that the establishment of a permanent physical structure on land belonging to another party—in that case, a boat ramp—when combined with continuous maintenance and use for the ten-year statutory period, was sufficient to establish the elements of adverse possession with respect to that property as a

matter of law. Thus, we stated in *Reitsma* that:

"The court erred by failing to find that the very act of openly placing a permanent physical structure on another's property without the true owner's permission and maintaining it there for more than ten years is itself an action that is so inconsistent with the true ownership of that property that *it is therefore notorious, adverse, hostile, and under claim of right as a matter of law. See Anthony,* 681 A.2d at 897–98 (finding adverse possession by placement of physical structures on disputed property and open use of structures); *Gammons,* 447 A.2d at 367–68 (explaining that ultimate fact to be proved in adverse possession case is whether the claimant has acted toward the land in question as would an average owner) * * *." *Reitsma,* 774 A.2d at 834–35. (Emphasis added and in original.)

Here, Amarantes testified that he erected and maintained a substantial structure on the claimed property: namely, a twelve-foot stone wall. The trial justice made no findings about whether the wall described by Amarantes was continuously maintained on the property for the requisite ten-year statutory period, and thus, whether it satisfied the elements of adverse possession as a matter of law as described in *Reitsma.* A similar analysis should also be made with regard to the signage and Amarantes's other alleged uses and improvements. Therefore, we remand for further fact-finding on this issue.

## III

### Clean Hands

The trial justice also erred in concluding that Amarantes, having knowledge of the true boundary line as early as 1978, engaged in an inequitable course of conduct when he decided to take steps to

divest Beck of his ownership of record title through adverse possession. As the trial justice stated:

"In fact, Amarantes knowing that he did not have record title to the disputed land, undertook a course of conduct designed to bootstrap himself into ownership, including deeding the property that he knew he did not own to himself and his wife and later to plaintiff. These deeds were predicated on his self-proclaimed adverse ownership without resorting to judicial adjudication. He then embarked on a pattern of use which on the basis of all the evidence could not have been designed to apprise the true owner of his claimed ownership. This [c]ourt is not aware of any authority that allows someone who knows he does not own land to occupy it and divest the true owner of interest. This action arises in equity. And plaintiff who must rely on Amarantes' prior conduct to fulfill the ten-year continuous use requirement must rely on a predecessor in title whose hands are hardly clean."

In essence, these findings indicate that the trial justice weighed Amarantes's intentional pursuit of an adverse-possession claim against the Tavareses, that he considered Amarantes's conduct in this respect as evidence of his "unclean hands," and that such inequitable conduct prevented the Tavareses from tacking on the period when he possessed the property to their period of ownership to establish the elements of adverse possession. But bootstrapping oneself into the ownership of property by actions and uses of the land that are adverse to the owner of record is exactly what adverse possession entails. Here, Amarantes's deeding of the disputed parcels to himself and his wife (and the recording of the deed) did not occur until 1991, after Amarantes already had used and possessed the land adversely to Beck

for the requisite ten-year period prescribed by law.

For these reasons, we vacate the judgment and remand for further fact-finding and a new decision and judgment. This will allow the trial justice to reconsider the evidence presented with respect to the elements of adverse possession without regard to Amarantes's knowledge that he did not possess title of record to the property; without regard to the fact that Beck, the owner of record, lived in Vermont when Amarantes was occupying and using the property as he did; and without regard to the fact that Amarantes attempted to bootstrap himself into owning the property in question.

## IV

### Evidentiary Rulings

In addition to challenging the trial justice's findings of fact, the Tavareses also take issue with several of his evidentiary rulings. Specifically, they assert that the trial justice erred in not permitting Amarantes to testify about what Rudolph Almy told him about the location of the boundary line for the property, and in excluding an affidavit by Robert Almy dated June 10, 1980. Both Rudolph and Robert Almy had died by the time of trial.

With respect to the excluded statements of Rudolph Almy to Amarantes, the trial justice concluded that they were inadmissible hearsay because they did not fall within any exception to the rule that bars such evidence. Without passing on the propriety of this conclusion, we note that these statements concerned the location of the property line when Amarantes purchased the land. Thus, presumably they were offered to show that Amarantes had a good-faith basis to believe that he owned the property in question when he bought it from the Almys. But even if Amarantes

initially believed that when he had the purchased property from the Almys it included the disputed parcels, his own later-conducted survey disabused him of that belief. Therefore, the excluded statements of Rudolph Almy before or in connection with Amarantes's purchase of the property would not have furthered the Tavareses need to show that, for the duration of his purported occupation of the property—the period that they sought to tack on to their own years of adverse use—Amarantes had used or possessed the parcels under a claim of right.

With respect to the Tavareses's challenge to the trial justice's exclusion of the Robert Almy affidavit, here again the trial justice found that the affidavit contained classic hearsay that was not subject to any applicable exceptions and that it lacked any reliable indicia of trustworthiness. The affidavit included statements to the effect that the Almys believed they owned the property south of the cart path and that they had cut wood on the property since at least 1925. This affidavit was prepared at Amarantes's direction. The trial justice apparently believed that Amarantes's involvement in obtaining the affidavit undercut the independent reliability of the statements therein.

Most importantly, however, admission of the affidavit into evidence would not have made a fundamental difference in the outcome of this case—even if its exclusion from evidence was error. Rule 103(a) of the Rhode Island Rules of Evidence provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected * * *." Here, if the Tavareses's purpose in offering the affidavit into evidence was to show Amarantes's initial mistaken belief that the property he purchased included the disputed parcels, then, as discussed above, his later knowledge about the true boundary line rendered his original mistake irrelevant. Alternatively, if it was offered to show that the Almys themselves had possessed the property adversely and, thereby, to tack on the period of their possession to the later owners in the chain of title, the affidavit alone would have been legally insufficient to establish such a claim. As noted previously, an adverse-possession claim must be proven by clear and convincing evidence. Because there was no other evidence besides the affidavit to support any suggested adverse possession by the Almys, the affidavit by itself would have been unavailing. Thus, under either scenario, admission of the Robert Almy affidavit into evidence would not have affected the outcome of this case. Consequently, if it was error to exclude the affidavit from the evidence, it was harmless error.

### Conclusion

Therefore, for the reasons stated herein, we sustain the plaintiffs' appeal in part and deny it in part. We vacate the judgment of the Superior Court, and remand this case to that court for reconsideration of the evidence consistent with this opinion. On remand, the Superior Court shall permit the parties to supplement the existing record by offering any additional testimony or other evidence that may bear on the issues presented by this case and then issue an amended decision and judgment that is not inconsistent with this opinion. Thereafter, any party who is dissatisfied with the judgment may file a timely notice of appeal.

Justice LEDERBERG participated in all proceedings but deceased prior to the filing of this opinion.