DECISION
Before this Court is the motion of Defendant Ashaway Pines, LLC ("Ashaway") for partial summary judgment[1] against Plaintiffs Kenneth and Joanne Panciera ("the Pancieras"). In their complaint, the Pancieras seek (1) an order restraining Ashaway from certain uses of real property owned by Ashaway, (2) a decree quieting title to another piece of real property known as "the laneway," and (3) damages for slander of title. Ashaway seeks partial summary judgment on all three of the Pancieras' claims, arguing that Ashaway has good title to the laneway (1) by adverse possession, (2) because of a boundary by acquiescence, and (3) as a deeded appurtenance. Ashaway acknowledges, however, that further proceedings are necessary to determine the precise bounds of the laneway. The Pancieras argue that there are issues of fact and law which preclude summary judgment in Ashaway's favor. This Court holds that Ashaway is entitled to partial summary judgment on the issue of ownership because Ashaway has title to the laneway by adverse possession as a matter of law. Jurisdiction is pursuant to G.L. 1956 §§ 8-2-13 and8-2-14. *Page 2 
 I Facts and Travel
Ashaway owns a parcel of land in Hopkinton, Rhode Island ("the Property"), recorded as Lots 7 and 7C on the Hopkinton Tax Assessor's Plat 3. The Property has no road access save for a "long, artificial causeway composed of fill running through a swamp," (Def Memo p. 1) hereinafter referred to as "the laneway." The Pancieras are record owners of a lot which is adjacent to the Property and which may include the laneway.
The Property is a portion of a three hundred thirty-seven acre tract to which Weeden Barber, Jr. ("Barber") took title in 1834 by deed from William and Caroline Thurston. See App. at 4.[2] On June 7, 1855, Barber conveyed a landlocked forty-acre portion of this land to Nathaniel H. Cook. See App. at 6.[3] In April 1881, Nathaniel Cook conveyed this parcel to *Page 3 
James Cook. See App. at 9.[4] In March 1884, James Cook conveyed the parcel to Jane Cook. See App. at 12.[5] In February 1894, Jane Cook conveyed the parcel to Gurdon Cook. See App. at 17.[6] In December 1902, Gurdon Cook conveyed the parcel to Frederick and Amanda Peterson.See App. at 22.[7] In July 1912, Frederick and Amanda Peterson conveyed the parcel to Pietro and Regina Panciera. See App. at 24.[8]
In November 1942, Louis Panciera, Antone Manetti, and John Ferguson as Executor of the Will of Regina Panciera executed separate deeds to convey their respective interests in the parcel to George and Nellie Manfredi. See App. at 27-28.[9] In 1979, George and Nellie Manfredi conveyed all of the Property, except for the one-acre lot where the original farmhouse sits, [10] to Nancy Vuono. See App. at 31.[11]
Sometime during or *Page 4 
after Nancy Vuono's ownership of the Property, the laneway came to be known as "Vuono Place." SeeDuhamel Aff.]} 19, Appx. at 672. In July 2000, Nancy Vuono conveyed the Property to a limited liability company, Vuono Place, LLC. See App. at 33.[12] In October 2000, Sarah Land Company, LLC f/k/a Vuono Place, LLC formally conveyed the Property to Sarah Land Company, LLC. See App. at 35.[13] In October 2004, Sarah Land Company, LLC conveyed the Property to Ashaway. See App. at 38.[14]
The laneway itself "constitutes an artificial causeway consisting of fill running through the swamp." Duhamel Aff. If 15, App. at 671. Nineteenth century maps show the laneway running from present Route 216 to the Property. See App. at 1-2; Duhamel Aff.]f 13, Appx. at 670. There are affidavits and deposition testimony to the effect that the laneway has remained substantially the same in length and location since at least the 1930s, and likely since at least 1870. SeePanciera Depo. at 69-72, App. at 578; Duhamel Aff. If 14, App. at 671. As to the quality of the laneway, there is evidence that Ashaway's predecessors in interest improved the land, e.g. by widening the laneway, raising its height, and installing culverts under the laneway. See Panciera Dep. at 57-60, 64, 70-71, App. at 575-78. Indeed, "[a]s different owners took [the Property] over, the first thing they tried to do was to improve that road somewhat, and eventually the biggest improvement came in the late `50s when Mr. Manfredi brought in a lot of gravel there."See Panciera Dep. at 66-67, Appx. at 577. There is further evidence that Ashaway's *Page 5 
predecessors in interest exclusively maintained the laneway, at least since approximately 1930. See Panciera Dep. at 774, App. at 579.
More importantly, there is undisputed evidence that Ashaway's predecessors in interest to the Property regularly conveyed rights-of-way and other possessory interests over the laneway. In 1892, Jane Cook leased six acres of the Property to Wilson Butler which included access "over the present traveled path to the highway, by her house. . . ." See App. at 17. In 1894, Gurdon Cook leased six acres of the Property to John Gallo, which included "the right to pass and repass . . . over and across the lane or passway, as now laid out, from the southerly side of the aforesaid premises to the highway." See App. at 20. In 1930, Regina Panciera granted to Arthur Panciera and Gladys Sullivan "[t]he right to pass and repass over the driftway leading from the highway across my land to and from the premises. . . ."See App. at 77. Arthur Panciera and Gladys Sullivan Panciera later deeded to Henry J. and Barbara P. Stafford their property together with this right-of-way. See App. at 78. In 1945, George and Nellie Manfredi conveyed an easement to Narragansett Electric "over, across and upon a right of way located on the Grantors' land. . . ." See App. at 30.[15]
When George and Nellie Manfredi conveyed the bulk of their property to Nancy Vuono, in addition to reserving approximately an acre of property for themselves, they also reserved "the right to use the existing driveway with others for the purpose of passing and repassing by any means of conveyance." See App. at 32. In 2000, Beverly Buck took title from Sarah Land Company, LLC to the same lot that had once been retained by the Manfredis, along with a "non-exclusive right of way over other land of the within grantor being an existing gravel road . . . to the highway known as U.S. Route 216. . . ." See App. at 42. *Page 6 
There is also undisputed evidence that the right-of-way has been consistently recognized as belonging to Ashaway's predecessors in interest. The laneway has been included as part of the Property on the tax assessor's maps. See Duhamel Aff]f 3, App. at 668. Additionally, the laneway is referred to as belonging to Ashaway's predecessors in interest when mentioned for land description purposes in deeds passing title to abutting property. For example, in a 1922 deed, George Burdick granted to Jennie E. Palmer land bounded "Westerly by land (Laneway) formerly of Nathaniel H Cook.[16] See App. at 62. This same language appeared in a 1936 deed from the heirs of Jennie E. Ennis to Thomas Winn. See App. at 63.
In 2005, Ashaway applied to the Hopkinton Zoning Board for a special use permit to operate a campground on the Property. Ashaway then went through site plan review before the planning board. In 2007, Ashaway received approval from the planning board, and scheduled a hearing on its application for a special use permit. Before the application could be heard, the Pancieras filed this action, seeking an order restraining Ashaway from proceeding with its plans for a campground, seeking to quiet title to the laneway, and seeking damages for slander of title.
On December 19, 2007, this Court granted a temporary restraining order barring Ashaway from proceeding on its special use permit application or modifying the laneway. On February 8, 2008, after viewing the disputed property, this Court denied the Pancieras' request for a preliminary injunction. On September 26, 2008, Ashaway moved for partial summary judgment as to all claims in the Pancieras' complaint, on the grounds that Ashaway has title to the laneway (1) by adverse possession, (2) as a boundary by acquiescence, and (3) as a deeded appurtenance. The Pancieras objected to Ashaway's motion, and both sides filed response memoranda. On February 16, 2009, this Court held a hearing on Ashaway's motion. At that time, the Court reserved decision on the motion. For the reasons that follow, this Court now *Page 7 
grants Ashaway's motion for partial summary judgment, holding that Ashaway has title to the laneway as a matter of law.
 II Standard of Review
On a motion for summary judgment, the moving party has the initial burden of (1) bringing forth admissible evidence to suggest that there is no genuine issue of material fact, and (2) establishing that the moving party is entitled to judgment as a matter of law. SeeOlshansky v. Rehrig Intern., 872 A.2d 282, 286 (R.I. 2005). To survive a motion for summary judgment, the non-moving party need only bring forth admissible evidence to demonstrate that there is a genuine issue of fact material to the legal issues of the case. Id. The hearing justice must view the evidence in the light most favorable to the non-moving party, and may neither weigh the evidence nor otherwise attempt to resolve factual disputes. See Palmisciano v. Burrillville Racing Ass'n,603 A.2d 317, 320 (R.I. 1992).
This standard reflects the policy that summary judgment is "a drastic remedy" that "should be dealt with cautiously." Estate of Giuliano v.Giuliano, 949 A.2d 386, 390 (R.I. 2008). Overall, the court should only grant a motion for summary judgment where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See Olshansky, 872 A.2d at 286.
 III Analysis A. Adverse Possession
Ashaway argues that there is abundant evidence to support each element of adverse possession. The Rhode Island General Assembly has codified the requirements for adverse possession in G.L. 1956 § 34-7-1, which reads as follows: *Page 8 
 Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action.
The Rhode Island Supreme Court has recognized more succinctly that "[t]o establish adverse possession, a claimant's possession must be `actual, open, notorious, hostile, under claim of right, continuous, and exclusive' for at least ten years." Carozza v. Carozza, 944 A.2d 161,166 (R.I. 2008) (quoting Tavares v. Beck. 814 A.2d 346, 350 (R.I. 2003)). Moreover, "[t]he party claiming adverse possession must establish each of these elements by `strict proof, that is, proof by clear and convincing evidence.'" Tavares, 814 A.2d at 350 (quotingCarnevale v. Dupee, 783 A.2d 404, 409 (R.I. 2001)). Because of the high standard of proof on a motion for summary judgment and on a claim of adverse possession, this Court will carefully discuss each element of adverse possession in turn.
First, possession of the laneway must have been actual. SeeCarozza, 944 A.2d at 166. For purposes of adverse possession, "[a]ctual possession has been defined as use and occupation of the property, or as possession in fact. . . ." 3 Am. Jur. 2d Adverse Possession § 18 at 101 (2002). "For adverse possession to occur, the use to which the land is put must be similar to that which would ordinarily be made by owners of similarly situated real estate." Tavares, 814 A.2d at 352 (citingSherman v. Goloskie, 95 R.I. 457, 466, 188 A.2d 79, 84 (1963)). Such uses include "encumbrance of the property" and "improvement of the property." 3 Am. Jur. 2d *Page 9 Adverse Possession § 29 at 110 (2002). "Visible evidence of use, such as . . . construction of permanent improvements, provides particularly compelling evidence of actual possession by an adverse claimant."Id.
Here, there is no dispute that Ashaway and its predecessors have actually possessed the laneway. Plaintiff Kenneth Panciera himself has testified that, since approximately 1930, Ashaway's predecessors in interest improved the land, e.g. by widening the laneway, raising its height, and installing culverts under the laneway. See Panciera Dep. at 57-60, 64, 70-71, App. at 575-78. Indeed, "[a]s different owners took [the Property] over, the first thing they tried to do was to improve that road somewhat, and eventually the biggest improvement came in the late `50s when Mr. Manfredi brought in a lot of gravel there."See Panciera Dep. at 66-67, App. at 577. There is further evidence that since approximately 1930, Ashaway's predecessors in interest have exclusively maintained the laneway. See Panciera Dep. at 774, App. at 579. Improving and maintaining the laneway for ingress and egress is exactly the use that would ordinarily be made by the owner of a narrow strip of land leading from a larger parcel to a road. SeeTavares, 814 A.2d at 352. The undisputed improvement and maintenance of the laneway by Ashaway and its predecessors therefore establishes the element of actual possession as a matter of law. See id,; 3 Am. Jur. 2dAdverse Possession § 29 at 110 (2002).
Second, possession of the laneway must have been "open and notorious."See Carozza, 944 A.2d at 166. "[T]he words `open and notorious possession' . . . mean that an adverse claim of ownership must be evidenced by such conduct as is sufficient to put a person of ordinary prudence on notice of the fact that the land in question is held by the claimaint as his or her own, including notice both to the record owner and to the public." 3 Am. Jur. 2d Adverse Possession § 63 at 139 (2002). *Page 10 
Here, there is no dispute that the Pancieras, their predecessors in interest, and the public were all on notice that Ashaway and its predecessors were holding the laneway as their own: not only did Ashaway and its predecessors openly improve the laneway, but they also granted and recorded easements and rights-of-way over the laneway. Specifically, in 1930, [17] Regina Panciera granted to Arthur Panciera and Gladys Sullivan "[t]he right to pass and repass over the driftway leading from the highway across my land to and from the premises. . . ."See App. at 77. Arthur Panciera and Gladys Sullivan Panciera later deeded to Henry J. and Barbara P. Stafford their property together with this right-of-way. See App. at 78. In 1945, George and Nellie Manfredi conveyed an easement to Narragansett Electric "over, across and upon a right of way located on the Grantors' land. . . ." See App. at 30. Each of these encumbrances has been recorded, thereby providing conclusive constructive notice to the Pancieras and their predecessors in interest. Furthermore, the easement to Narragansett Electric apparently resulted in the manifestation of telephone poles on or near the laneway.See Panciera Dep. at 72-73, App. at 578-79. These telephone poles constitute significant evidence of the open and notorious nature of Ashaway's predecessors' possession. See, e.g., Reitsma v. PascoagReservoir Dam, LLC, 774 A.2d 826 (R.I. 2001) ("[T]he very act of openly placing a permanent physical structure on another's property without the true owner's permission and maintaining it there for more than ten years is itself an action that is so inconsistent with the true ownership of that property that it is therefore notorious, adverse, hostile, and under claim of right as a matter of law."). Accordingly, Ashaway and its predecessors openly and notoriously possessed the laneway as a matter of law. See id.; 3 Am. Jur. 2d AdversePossession § 63 at 139 (2002). *Page 11 
Third, possession of the laneway must have been hostile. SeeCarozza, 944 A.2d at 166. "[T]o constitute a hostile use, the adverse possessor need only establish a use `inconsistent with the right of the owner, without permission asked or given, . . . such as would entitle the owner to a cause of action against the intruder [for trespass].'"Tavares, 814 A.2d at 351 (citing 16 Powell on Real Property § 91.05[1] at 91-23 (2000)) (brackets in original case). Here, the easements and rights-of-way recorded by Ashaway's predecessors are wholly inconsistent with ownership by the Pancieras' predecessors as a matter of law.See Sleboda v. Heirs of Law of Harris, 508 A.2d 652, 658 (R.I. 1986) (holding that a deed recorded by an adverse possession claimant constitutes evidence of hostility); see also Sakonnet Point MarinaAss'n, Inc. v. Bluff Head Corp.. 798 A.2d 439, 442 (R.I. 2002) ("It is a basic tenet of the law of real property that an easement cannot be reserved by deed over property that the reserving party does not own. . . .") (citing 4 Powell on Real Property § 34.04[8] at 34-37 (2000); 7 Thompson on Real Property § 60.03(a)(4) at 412 (1994)). Accordingly, Ashaway and its predecessors have established a prima facie case for the element of hostility. See Tavares, 814 A.2d at 351.
The Pancieras argue that there is an issue of fact as to the hostility element of Ashaway's affirmative defense of adverse possession. Specifically, the Pancieras argue (1) that Ashaway's evidence is consistent with permissive rather than hostile use of the laneway, and (2) that Ashaway's evidence is consistent with an easement over the laneway, which would not be hostile to the Pancieras' claim of title. However, Ashaway and its predecessors in title have recorded documents granting easements and rights-of-way over the laneway. For the same reason that the easements and rights-of-way recorded by Ashaway's predecessors are wholly inconsistent with ownership by the Pancieras and their predecessors — namely, that one cannot grant a right-of-way across land that one does not own (including land that one may use with the *Page 12 
owner's permission and land over which one has an easement) — these recorded documents are also wholly inconsistent with either permissive use or an easement. See Sleboda, 508 A.2d at 658; see also SakonnetPoint, 798 A.2d at 442 (citing 4 Powell on Real Property § 34.04[8] at 34-37 (2000); 7 Thompson on Real Property § 60.03(a)(4) at 412 (1994)). The Pancieras have raised no suggestion as to how these grants by Ashaway's predecessors could be consistent with ownership of the laneway by the Pancieras and their predecessors. Accordingly, there is no dispute that Ashaway has established hostility as a matter of law.
Fourth, possession of the laneway must have been "under claim of right." See Carozza, 944 A.2d at 166. "[A] claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the owner." Tavares, 814 A.2d at 351
(citing Picerne v. Sylvestre, 122 R.I. 85, 91-92, 404 A.2d 476, 479-80
(1979)). Thus, the main distinction between hostility and claim of right is that claim of right must be "visible" or "objectively observable."See id. Here, there is no dispute that the improvement and maintenance of the laneway are objectively observable, as are the recorded rights-of-way and easements. There is similarly no dispute that these observable uses of Ashaway and its predecessors are inconsistent with ownership of the laneway by any other party. Accordingly, Ashaway has established the element of claim of right as a matter of law.See id.
Fifth, possession of the laneway must have been continuous for a period often years. See Carozza, 944 A.2d at 166. "The existence of . . . visible indications of hostile claims is taken into consideration in determining whether, in a given case, adverse possession has been continuous." 3 Am. Jur. 2d Adverse Possession § 74 at 149. "Continuity may be just as effectively shown by the successive possessions of several persons between whom the requisite *Page 13 
privity exists" Id. This principle is clear from the language of § 34-7-1, the Rhode Island adverse possession statute, which begins: "Where any person or persons, or others from whom he, she, or theyderive their title . . ." (Emphasis added.)
Here, the evidence indicates that the elements of adverse possession likely began in the nineteenth century, but certainly began in the 1930s. Regina Panciera, one of Ashaway's predecessors, recorded a right-of-way over the laneway in 1930. Plaintiff Kenneth Panciera has testified that, at least as far back as the early 1930s, the laneway was always maintained by Ashaway's predecessors. Specifically, he stated that "[a]s different owners took it over, the first thing they tried to do was to improve the road somewhat. . . ." Panciera Dep. at 66, App. at 577. When asked whether he began observing this activity in the 1930s, Mr. Panciera replied, "Yeah. We have seen the road gradually widen out and get higher over the years, yeah." Id. at 67, App. at 577. Ashaway's predecessors' claim to the laneway was sufficiently open and notorious at that time that deeds to property abutting the laneway from 1922 and 1936 refer to the laneway as belonging to Ashaway's predecessors.See App. at 62-63. From the 1930s on, evidence of the open, notorious, and hostile possession by Ashaway and its predecessors, under claim of right to the laneway, has only continued to mount. Overall, however, the continuous ten-year period required for title by adverse possession to vest was complete in the 1940s as a matter of law.
Sixth and finally, possession of the laneway must have been exclusive during the continuous ten-year period. See Carozza, 944 A.2d at 166.Black's Law Dictionary (7th Ed.) defines exclusive possession as "[t]he exercise of exclusive dominion over property, including the use and benefit of the property." In the context of adverse possession, exclusivity requires only that "the claimant must hold the possession of the land under a claim of ownership and not on behalf of another." 3 Am Jur. 2d Adverse Possession § 67 at 143. The Rhode Island *Page 14 
Supreme Court has recognized exclusivity where adverse possession claimants exercised dominion over disputed land, even though the defendants regularly used the land for passage to and from the Narragansett Bay. See Gammons v. Caswell 447 A.2d 361, 368 (R.I. 1982). More specifically, in Gammons the court held that "[i]n order to find that the property was not used exclusively by the [claimants], there would have to be evidence indicating that the defendants or others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it."Id.
Here, all of the evidence suggests that Ashaway and its predecessors exclusively exercised dominion by improving and maintaining the laneway, and by granting rights-of-way and easements over the laneway. There is no evidence that the Pancieras or their predecessors exercised any sort of possessory use of the laneway, but only that Plaintiff Kenneth Panciera occasionally traversed the laneway — approximately once per year — while perambulating the whole of his property. See Panciera Dep. at 54-56. Because the Supreme Court has held that evidence of "merely walking across" property is insufficient to overcome a showing of exclusive possession, Ashaway has established the element of exclusivity as a matter of law. See Gammons. 447 A.2d at 368.
Ashaway has therefore brought forth undisputed evidence to establish a prima facie case of adverse possession as a matter of law. Therefore, summary judgment will be appropriate unless the Pancieras can point to some legal reason that Ashaway is not entitled to title by adverse possession. In this vein, the Pancieras argue that Ashaway is not entitled to title by adverse possession as a matter of law because the Pancieras have donated development rights to the Rhode Island Department of Environmental Management ("DEM"), and because a private party cannot adversely possess public land. This argument fails for two reasons. *Page 15 
First, the Pancieras did not actually include the laneway in their deed to DEM. The deed conveys certain property defined by metes and bounds; those metes and bounds describe an area which does not include the laneway.[18] See App. at 640. Moreover, the deed expressly provides that the laneway is a boundary of the deeded property.See id. The Pancieras argue that they intended to convey development rights to the laneway, and that their intent should trump the language of the deed. This argument, however, is contrary to the law. The long-standing rule, first set forth in Rhode Island in the case ofSegar v. Babcock, 18 R.I. 203, 203, 26 A. 257, 258 (1893), is that boundaries which are explicitly described "must control in the construction of a deed as the surest indication of the intention of the parties, and that resort can be had to parol testimony only when such [descriptors] are uncertain or ambiguous in applying the deed to the land." This rule is a specific application of the general rule that "in the absence of fraud or mistake, parol or extrinsic evidence is not admissible to vary, alter or contradict a written agreement."Supreme Woodworking Co. v. Zuckerberg. 82 R.I. 247, 252, 107 A.2d 287,290 (1954). Here, the deed to DEM is unambiguous, and there is no evidence of fraud or mistake. The terms of the deed itself are therefore controlling. Accordingly, the Pancieras' deed to DEM did not include the laneway, and the State therefore has no ownership interest in the laneway.
Second, the Pancieras could not have deeded to DEM what they did not own, and they did not own the laneway at the time of their conveyance to DEM. Ashaway has proven its adverse possession claim. Title to the laneway first vested in Ashaway's predecessors when the ten-year period was finished running — at the latest, in the 1940s. See 10 Thompson onReal *Page 16 Property § 87.03 at 87 (1994) ("[W]hen adverse possession is completed, title passes from the former owner to the adverse possessor."). Regardless of whether a judicial decree is ever entered, title by adverse possession is equal to deeded title. See id. § 87.03 at 91-92. Accordingly, the Pancieras did not own the laneway at the time they executed the deed to DEM and, therefore, could not have deeded development rights in the laneway to DEM.
In sum, the Pancieras have not brought forth evidence to dispute that Ashaway has established possession of the laneway that is actual, open, notorious, hostile, under claim of right, continuous, and exclusive for at least ten years. Neither do the Pancieras' legal arguments afford them any relief. Accordingly, there is no issue of fact or law remaining as to Ashaway's affirmative defense of adverse possession. Ashaway has title to the laneway as a matter of law.
Because Ashaway has title to the laneway by adverse possession, the Pancieras are entitled to neither the requested injunctive relief nor a decree that they own the laneway. This Court therefore grants Ashaway's motion for partial summary judgment dismissing the Pancieras' claims. Additionally, because Ashaway has already prevailed on its motion, this Court need not address Ashaway's arguments grounded in the doctrines of the lost grant presumption, boundary by acquiescence, and deeded appurtenance.
 B. Slander of Title
Ashaway also moves for summary judgment against the Pancieras' claim for slander of title. To survive a motion for summary judgment on their claim for slander of title, the Pancieras must bring forth evidence "that [Ashaway] maliciously uttered false statements about [the Pancieras'] ownership of real estate which resulted in [the Pancieras] sustaining an actual pecuniary loss." Arnold Road Realty Assocs. . LLCv. Tiogue Fire Dist. 873 A.2d 119, 125 (R.I. 2005) (quotingMontecalvo v. Mandarelli, 682 A.2d 918, 923 (R.I. 1996)). The element of *Page 17 
uttering a false statement may be satisfied by "willful recordation or publication of untrue material that is disparaging to another's title." Am. Jur. 2d Libel and Slander § 524 at 900; see also Eastern Motor Inns,Inc. v. Ricci, 565 A.2d 1265, 1273 (R.I. 1989) (referring to "uttering or publishing" a false statement as a basis for slander of title). It is black letter law that "a claim of slander of title is without merit if the claim of title is based upon a claim of adverse possession which has not yet been decreed, rather than upon a chain of title." Am. Jur. 2dLibel and Slander § 526 at 903.
Here, the Pancieras have brought forth no evidence that Ashaway uttered, recorded, or published any false statement regarding title to the laneway. Instead, the undisputed facts establish that Ashaway has asserted a valid claim for adverse possession. Even though Ashaway's title to the laneway had not yet been decreed when the Pancieras filed this action, title was already vested with Ashaway. See 10 Thompson onReal Property § 87.03 at 87 (1994). Therefore, there is no genuine dispute that Ashaway's publications regarding title to the laneway were true. Moreover, because the Pancieras had no interest in the laneway, they cannot demonstrate any damages based on Ashaway's publications. Accordingly, the Pancieras cannot prevail on their claim for slander of title as a matter of law. This Court therefore grants Ashaway's motion for summary judgment and dismisses the Pancieras' claim for slander of title.
 IV Conclusion
This Court now grants Ashaway's motion for partial summary judgment on the ground that Ashaway has title to the laneway by adverse possession as a matter of law. Accordingly, Plaintiff is not entitled to (1) injunctive relief, (2) a declaration that Plaintiff has title to the laneway, or (3) damages for slander of title. Further proceedings are necessary, however, in order to determine the precise bounds of the laneway. *Page 18 
Counsel for Ashaway shall submit an order within ten days.
[1] Although the motion is captioned as a motion for summary judgment, in actuality Ashaway seeks only partial summary judgment. The motion will be treated accordingly.
[2] As a preliminary matter, all deeds referenced in this Decision were authenticated. SeeDuhamel Aff. U 5, App. at 669. The deed from the Thurstons to Barber contains a metes and bounds description followed by a reference to a plat:
 Beginning at the southwest corner of said land it being the southeast corner of Joseph D. Kenyons land thence running easterly bounding southerly by a highway until it comes to a lot of land belonging to Joseph M. Knowles thence running easterly bounding southerly by said Knowles land until it comes to the Paucatuck River thence bounding by said Paver up stream until it comes to Deacon Weeden Barbers land thence running west to land of David L. Langworthy bounding northerly by heirs of Hezekiah Babcock land partly and partly by land of Thomas P. Wells-formerly Elder John Gardner's Land — thence running southerly bounding westerly by said Langworthy's land from there running west four and one quarter degrees north till it comes to a stake and stones — and from thence running westerly bounding northerly by said Langworthy's land partly and partly by heirs of William Coon land till it comes to a heap of stones — from thence running south thirteen degrees east thirty four chains and twelve links and bounded westerly by Joseph D. Kenyon's land to the first mentioned bounds or however the same may be bounded the same being described on the plat of the division of the real estate of George Thurston Esq. Jeremiah Thurston and George Thurston Jun. late of Hopkinton deceased contains the lot No 10 which fell to Caroline Thurston in the divisions aforesaid which of record will fully appears. . . .
Ashaway has provided a rough visual representation of this metes and bounds description. SeeApp. at 479.
[3] This deed describes a parcel of "forty one and one sixth acres . . . more or less" by the following metes and bounds:
 Beginning at the northwest corner, it being the northeast corner of Joseph D. Kenyon's land thence running south ten degrees east bounded westerly by Joseph D. Kenyon's lands 26 chains and 15 links thence north fifty four and a half degrees east fifteen chains sixty nine links, thence south sixty five degrees east four chains thirty two lengths thence north 11 ¾° east 16 chains 75 links to the southeast corner of Henry Clark's land bounded by land of the said Weeden Barber Jr easterly and southerly thence 24 chains 88 links to the first named corner bounded northerly by land of Henry Clark.
Ashaway has provided a visual representation of this metes and bounds description. SeeApp. at 487.
[4] This deed describes the land as follows:
 that tract of land situated in said Hopkinton bounded as follows on the north by land of the grantors of this deed on the east by lands of Weeden Barber on the south by lands of the grantee of this deed and on the west by lands of Pardon Lewis and Daniel L. Babcock it being a tract of land deeded to Samuel Langworthy January A.D. 1793 known as the John Coon lot together with five acres and a half acre added to it on the north and east of said lot containing in all by estimate thirty one acres . . . more or less.
 
[5] In addition to providing a metes and bounds description, this deed contains the following description: "the same premises conveyed to me by Nathaniel H. Cook and wife by their deed dated April 4-1881. . . ."
[6] In addition to providing a metes and bounds description, this deed contains the following description: "the land conveyed to me by James H. Cook by deed recorded in Deed Book in said Hopkinton No. 20 at page 5-83 following." The deed also purports to convey the land "with dwelling house and other improvements thereon Id.
[7] In addition to providing a metes and bounds description, this deed contains the following description: "[the] same premises conveyed by Deeds of Weeden Barber and Henry Clarke to Nathaniel H. Cook." The deed also purports to convey the land "with dwelling house, barns and other improvements thereon. . . ." Id.
[8] In addition to providing a metes and bounds description, this deed contains the following description: "[the] same premises conveyed by Gurdon Cook to these grantors by deed dated July 30, 1912, and recorded in Records of Deeds in said Town of Hopkinton, book 29, page 108." The deed also purports to convey the land "with dwelling house, barn and other improvements thereon. . . ." Id.
[9] In addition to providing a metes and bounds description, these three deeds contain the following identical description: "the same premises conveyed by Frederick W. Peterson and Amanda C. Peterson to Pietro Panciera and Regina Panciera by deed dated December 18th, 1902 and recorded in Land Evidence of said Hopkinton Book No. 26 at Page 331, and same premises conveyed by Deeds of Weeden Barber and Henry Clarke to Nathaniel H. Cook."
[10] It is uncontested that the Manfredis later conveyed the house lot to Vuono as well. SeeApp. at 41.
[11] This deed describes one parcel of conveyed land as follows:
 A certain lot or tract of land situated in said Hopkinton contaqning [sic] by estimation 73 acres, more or less, and is bounded substantially as follows: Northerly by the land of the heirs of Cristofore Panciera, Easterly and Southerly by land formerly of Weeden Barber and Westerly by land now or formerly of heirs of Joseph D. Kenyon and land now or formerly of John and Caroline Cantelin and being the same premises conveyed by Frederick W. Peterson and Amanda C. Peterson to Pietro Panciera and Regina Panciera by deed dated July 30, 1912 and recorded in records of deeds in said Town of Hopkinton, Book 29, page 108.
[12] This deed describes the land first as "[t]hat certain tract or parcel of land, with all buildings and improvements thereon, located at 22 Vuono Place . . . being more particularly bounded and described on EXHIBIT `A'. . . ." EXHIBIT "A" provides the same description as the deed from the Manfredis to Vuono. See supra at n. 11.
[13] This deed contains exactly the same description as the deed described supra at n. 12.
[14] This deed contains exactly the same description as the deed described supra at n. 12.
[15] Telephone poles have existed on or near the laneway for an indeterminate amount of time. SeePanciera Dep. at 72-73, App. at 578-79.
[16] Nathaniel H. Cook owned the Ashaway property from 1855 to 1881.SeeApp. at 6-9.
[17] This discussion begins in 1930 because that is the point at which the evidence indicates beyond dispute that Ashaway's predecessors began exclusively improving and maintaining the laneway. It is worth noting, however, that Ashaway's predecessors began encumbering the laneway in the nineteenth century.
[18] The DEM deed, recorded in the Town of Hopkinton book 422, pp. 398-420, provides at page 412 (labeled as page 5 of 10) that the bounds of the granted land travel from a point at the end of a line running southeasterly along a stone wall, bounded southwesterly by certain "Sarah Land Company land," and "[tjhence turning an interior angle of 229 ° 50'39" and running southwesterly, bounded northwesterly by said Sarah Land Company Land, a distance of One Thousand Eighty-Nine and 51/100 (1,089.51') feet to easterly line of Vuono Place; Thence turning an interior angle of 111° 06'39" and running southeasterly, bounded southwesterly by said Vuono Place, a distance of Four Hundred and 00/100 (400.00') feet to a point. . . ." This description not only provides that the laneway (here called "Vuono Place") is not contained within the grant to DEM, but also uses the laneway as an external boundary marker.