DECISION
Before this Court is an action by the joint-plaintiffs, Theodore and Maria Elisa A. Faltus (Faltuses) and Kenneth DeHertogh (Mr. DeHertogh), who assert ownership of several portions of land via adverse possession pursuant to G.L. 1956 § 34-7-1. Defendants (and counterclaimants) Normand Beauregard and Yvonne Seggerman (Beauregards or the Defendants) seek to quiet title of the disputed property and bring a trespass claim against both Plaintiffs.
 I Facts and Travel
After hearing testimony and reviewing exhibits at trial, this Court has made the following findings of fact. This case arises out of a dispute as to the rightful ownership of land located between three abutting lots in Cumberland, Rhode Island. Each of the *Page 2 
lots were devised from a single parcel of land by way of a subdivision plat recorded in 1964 and entitled "`Pine Oaks' Owned by Harold Large, Jr. Inc.," (Pine Oaks Plat). There is no dispute as to the property lines as described in the respective deeds. Each deed refers to the original plat, and markers indicating the physical boundaries of the properties have been discovered on the land.
In June of 1967, Mr. DeHertogh purchased from the original developer, Donald Large, Jr., Lot #14 of the Pine Oaks Plat (DeHertogh Property). Mr. DeHertogh has resided on the DeHertogh Property, now identified as 45 Louise Luther Drive, since its purchase. To the east of the DeHertogh Property lies the property of the Faltuses. The Faltus property, designated as Lot #2 of the Pine Oaks Plat and now known as 47 Louise Luther Drive (Faltus Property), was purchased from the developer in 1966 by Mr. Ralph Cote (Mr. Cote). Mr. Cote owned the Faltus Property for twenty (20) years, living in the home with his wife, Pauline, and nine children.[1] In 1986, Mr. Cote sold the Faltus Property to Mr. and Mrs. Mary Monahan, who remained the owners of the parcel for thirteen (13) years. In 1999, the Faltus Property was purchased by Mr. and Mrs. Theodore Faltus, the Plaintiffs and record titleholders at the time of filing the instant suit.
The Beauregards reside at 12 Howard Lane in Cumberland, Rhode Island (Beauregard Property). The Beauregard Property, Lot #1 of the Pine Oaks Plat, was purchased from the developer on October 15, 1986, and was referenced throughout the trial as the "sand pit," as it sits approximately twenty (20) feet below the Plaintiffs' properties. The northeast corner of the Beauregard Property is positioned between the Plaintiffs' respective plots. It is this corner of the property, and its adjoining boundaries, that are at issue here. *Page 3 
 A Facts Pertinent to The Faltus Claim
The property claimed by the Faltuses is characterized as a flat, grassy area, partially enclosed by trees and apt to be covered with pine needles (Disputed Area or the Faltus Claim). The Disputed Area sits between the Faltuses' deeded property line and the top of a significant descending slope, [2] at the bottom of which is the Beauregards' home. As noted above, the developers first sold Lot #2 to Mr. Ralph Cote in 1966. Throughout his twenty (20) year ownership, Mr. Cote mowed the Disputed Area, sometimes using portions of it to park vehicles or play games. At one point Mr. Cote hosted a large wedding for his eldest daughter within the Disputed Area. In 1986, Mrs. Mary D. Monahan, together with her late husband, Eugene, purchased Lot #2 from the Cotes. Plaintiffs have repeatedly asserted that upon purchase, the Monahans continued to use the Disputed Area in a manner similar to that of the Cotes. Additionally, Plaintiffs aver that the Monahans planted lilac bushes and stored firewood in the area, though the individuals to have undertaken such efforts were not conclusively identified at trial.
On May 11, 1999, the Faltuses purchased Lot #2 from the Monahans. From time-to-time the Faltuses would seed, fertilize, water, and mow the grass. They also used a compost pile, erected a portable playhouse, planted mountain laurel, allowed their children to play in the area, placed a park bench in the area, and installed an electric dog fence extending to the top of the slope.
Shortly after their purchase in May of 1999, the Faltuses commissioned a survey of their land, which conclusively indicated that the Beauregards owned the property now *Page 4 
in dispute. Following their survey, the Faltuses approached Mr. Beauregard in hopes of purchasing the Disputed Area. The Beauregards were not amendable to sale, but also did not at that point request that the Faltuses vacate the Disputed Area. In 2002, Mr. Beauregard hired a surveyor to verify his property line.[3] Soon thereafter, the Beauregards asked the Faltuses to remove their materials from the Disputed Area. The Faltuses began to do so, but stopped soon after. This suit followed.
 B Facts Pertinent to The DeHertogh Claim
The property claimed by Mr. DeHertogh encompasses an area extending approximately one-hundred (100) feet west and fifty (50) feet south from the easternmost point of the Beauregards' property line, ending at the top of same slope (though a different portion) to which the Faltus Claim refers (DeHertogh Claim). For the purposes of clarity, the DeHertogh Claim comprises four separate areas: (1) the area of cleared underbrush (Cleared Underbrush), (2) the gravel turnaround (Turnaround), (3) the asphalt driveway (Driveway), and (4) a row of trees (Screening Trees).
The Cleared Underbrush is outlined by the hill's ridgeline to the west and the south. The record lot line and natural vegetation mark the northern boundary, while the Turnaround signals the boundary to the east. Excepting its maintenance, Mr. DeHertogh makes no use of the area, other than using it for "screening" purposes.
The Turnaround is a rectangular area that is bordered by the paved Driveway to the north and natural vegetation to the west. The Turnaround is located entirely on land deeded to the Beauregards and was primarily used to temporarily and intermittently park *Page 5 
vehicles. The exact dimensions of the Turnaround are difficult to discern, as it is composed of mixed gravel and dirt and is decidedly less permanent than its paved counterpart. Three railroad ties in various states of decomposition and frequently masked by pine needles from surrounding trees mark the southern boundary of the Turnaround. An area consisting of juniper, hemlock, lilac, and pine trees compose the Turnaround's eastern border. The northern boundary of the Turnaround is the portion of the Driveway that encroaches upon the Beauregard Property. Prior to the purchase, Mr. Beauregard walked the property with the developer and was aware that Mr. DeHertogh utilized the Turnaround to park a green box truck. The developer allowed Mr. DeHertogh to use the land in that manner, and no objection was made by the Defendants until shortly before the commencement of this suit.
The Driveway was installed by the developer and has remained in the same location since 1967. Beginning on Louise Luther Drive, the Driveway enters the DeHertogh Property just north of utility pole #5 and bends to the north (in the shape of an arch). The southern-most portion of the Driveway is the apex of the arch, which encroaches upon the Beauregards' deeded property by eighteen inches. The remainder of the Driveway curves north toward the DeHertogh home and is not at issue here.
To the east of the Driveway (and effectively indicating the easternmost portion of the Beauregards' land) is the area consisting of juniper, hemlock, lilac, and pine trees. The vegetation was planted by Mr. DeHertogh at some point prior to the Beauregards' purchase of their property in 1986, and primarily served the purpose of screening between the DeHertogh Property and the Faltus Property. Mr. DeHertogh planted these plants without regard to his boundaries and was unaware as to whether the plantings were *Page 6 
on his land, or the land of another.
 II Analysis
In Rhode Island, an individual may obtain title to the land of another if she exercises actual, open, notorious, hostile, under claim of right, continuous, and exclusive use of the property in question for a period in excess of ten years. G.L. 1956 § 34-7-1; see also DelSesto v. Lewis,754 A.2d 91, 94 (R.I. 2000). "The party who asserts that adverse possession has occurred must establish the required elements by strict proof, that is, proof by clear and convincing evidence."Corrigan v. Nanian, 950 A.2d 1179 (R.I. 2008) (quotingTavares v. Beck, 814 A.2d 346, 350 (R.I. 2003)); seealso Carnevale v. Dupee, 853 A.2d 1197, 1199 (R.I. 2004).
This is a consolidated action, in which the co-plaintiffs have each brought claims of adverse possession against the Beauregards. As the factual circumstances underlying their respective claims differ, the Court's analysis focuses on each party separately.
 A The Faltus Claim
Given the nature of the facts in the case at bar, this Court finds it unnecessary to comprehensively evaluate the elements of actual and exclusive use as they pertain to the Faltuses' adverse possession claim. Defendants admit being aware that the Faltuses and their predecessors-in-interest used the Disputed Area, and that the Defendants' own use of the property was limited to periodically walking its boundaries and trimming plants at the top of the slope. Based on these undisputed facts, the Court finds that the Faltuses and their predecessors-in-interest have met the elements of actual and exclusive use of *Page 7 
the Disputed Area by clear and convincing evidence.
 1 Open and Notorious Use for Ten Years
As this suit was filed in 2002, a mere three years after the Faltuses took ownership of their property, the Faltuses must supplement evidence of their prima facie use of the Disputed Area with competent, admissible evidence as to their predecessor-in-interest's similar use of the Disputed Area for the seven years prior. See § 34-7-1; Taffinder v. Thomas,119 R.I. 545, 549, 381 A.2d 519, 521 (1977); Monarch Builders,Inc. v. Natynak, C.A. No. 99-5681, 2004 WL 1351360, at *4 (R.I. Super. May 17, 2004). Alternatively, the Faltuses may demonstrate that a predecessor-in-interest sufficiently established an adverse possession claim, rendering the Faltuses the proper owners of the Disputed Area. See § 34-7-1.
A trespasser acts in a manner that is open and notorious when "the claimant goes upon the land openly and uses it adversely to the true owner. The owner then becomes chargeable with knowledge of what is done openly on the land." Carnevalle,853 A.2d at 1201 (quoting Gammons v. Caswell,447 A.2d 361, 367 (R.I. 1982)). The Faltuses have asserted that during Mr. Cote's ownership of Lot #2, Mr. Cote utilized the Disputed Area openly and notoriously for a period in excess of 10 years, so as to sustain a claim of adverse possession. Hence, it is with Mr. Cote's ownership that this Court's analysis begins. As noted above, Mr. Cote purchased Lot #2 in 1966. Throughout his twenty (20) year ownership of Lot #2, Mr. Cote mowed the grass and played games with his nine children in the area now in dispute. Mr. Cote also helped his late wife prepare the land for a vegetable garden and would periodically park his mobile home and vehicles *Page 8 
belonging to his children in the Disputed Area. During one summer, Mr. Cote hosted a wedding for his daughter with approximately two-hundred (200) guests in the Disputed Area.
Though this Court is convinced that many of these activities did occur, it finds them insufficiently adverse to the Defendants' ownership of the land, and therefore unable to meet the statutory requirement of open and notorious use for a period of ten years. While Mr. Cote's testimony indicated that he often parked his mobile home in the Disputed Area, Mr. Cote also testified as to having sold that same mobile home prior to the developer building a house at 12 Howard Road. The record reveals that the Howard Road home was built in 1971 or 1972. Thus, the longest period of time in which Mr. Cote could have parked the vehicle on the Disputed Area was seven years. In addition, Mr. Cote testified that he never needed to rake the leaves in the Disputed Area because it was surrounded by pine trees, and that whatever leaves fell in that area would "blow right across [the] property." After testifying that the Disputed Area required no raking, Mr. Cote went on to confirm that he had not planted any grass in the area, that the area was better characterized as a "natural field" than a "manicured lawn," and that he cut the grass every two to three weeks during the summer.
The evidence presented to this Court has left it unconvinced that Mr. Cote's use of the Disputed Area was sufficient to meet the requisite elements of adverse possession. Mr. Cote's testimony lacked clarity as to several portions of the property at issue and his use thereof.[4] Additionally, the majority of the activities alleged to have taken place in the *Page 9 
Disputed Area while owned by Mr. Cote were temporary and periodic, thus failing to conclusively establish the required ten-year continuously open and notorious use element of adverse possession. Mr. Cote admitted to selling his mobile home at some point between his purchase of Lot #2 and the building of a house on the Beauregards' land — a period of seven years. He parked his children's cars during various times and at various places on the Disputed Area, but offered this Court no exact time period during which this parking activity took place. Short of cutting the grass, "as frequently as it needed to make it look halfway decent," Mr. Cote made few improvements to the Disputed Area. This Court finds that Mr. Cote's arbitrary acts of mowing and parking, coupled with his playing of games with his children within the Disputed Area, do not rise to a level that would alert the Defendants as to a possible challenge to their title. Thus, any claim utilizing Mr. Cote's tenure as the owner of Lot #2, the Faltus Property, must fail.
Concerning the Faltuses direct predecessors-in-interest, the Monahans, this Court finds the evidence provided to be inadequate as to the manner, scope, and duration to which the Disputed Area was used.[5] In attempting to establish the requisite open and notorious use of the property by the Monahans, the Faltuses rely almost entirely upon the testimonies of Messrs. DeHertogh and Beauregard. Mr. DeHertogh testified that he knew the Cotes, Monahans, and Faltuses, and that he "continually" observed them using the Disputed Area, taking part in such activities as cutting the grass, raking leaves, playing games, having parties, and "constructing walls, a clubhouse, and woodpiles."
Like Mr. Cote, it appears as though the Monahans mowed the grass within the Disputed Area. Mr. Beauregard himself acknowledges that the area was mowed and that *Page 10 
some piles, composed of "clippings and/or the branches and stuff from the property" had accumulated; though he is unsure what party was actually responsible for having done so. However, little more is certain as to the Monahan's use of the land beyond such mowing and piling. Contrary to Mr. DeHertogh's sworn affidavit, in which he testifies to having witnessed the Monahans raking leaves in the Disputed Area, Mr. Cote testified that no raking was necessary as the leaves "bl[e]w right across [the] property." Additionally, Mr. DeHertogh's testimony recalls both the Monahans and Cotes using or adding to a compost pile found within the Disputed Area. No mention is made by Mr. Cote, however, in either his affidavit or his videotaped deposition, of this purported compost pile. Given the ambiguity as to who began using the compost pile and when it was used, this Court is unable to find that the evidence clearly and convincingly demonstrates that the Monahans utilized the pile for seven years as alleged by the Faltuses. Similarly, the Monahan's alleged use of the Disputed Area for playing games and sports, as the Cotes had, is not clearly and convincingly supported by the evidence. Though Mr. DeHertogh asserts the Monahans' children used the Disputed Area, Mr. DeHertogh fails to indicate with specificity how frequently and for how many years these activities occurred.
Based on the evidence presented by the parties, this Court finds that the Monahans' use of the Disputed Area was likewise insufficient to place the Beauregards on notice that a claim might be made against their title. The testimony offered by Messrs. DeHertogh and Beauregard do not rise to the level of clear and convincing evidence so as to establish open and notorious use of the property at issue. The Monahans' use during their ownership period is thereby rendered insufficient, by itself or in conjunction with the three years of alleged possession by the Faltuses, to justify forfeiture of title. As *Page 11 
such, the Faltuses cannot meet the burden of tacking the seven-year period prior to their purchase of the Faltus Property, and therefore cannot establish the statutory ten-year open and notorious use of the Disputed Property requisite in proving adverse possession.
 2 The Remaining Elements
This Court withholds an extended analysis of the elements of hostility and claim of right, as the Faltuses have unquestionably failed to demonstrate by clear and convincing evidence that they exercised open, notorious, and continuous use of the Disputed Area for a period of ten years.
 B The DeHertogh Claim
Mr. DeHertogh's claim differs from the Faltuses' in many respects and warrants a separate analysis. Most notably, Mr. DeHertogh has no predecessor-in-interest and therefore any discussion regarding tacking is irrelevant. Based on the evidence and testimony presented a trial, this Court finds that Mr. DeHertogh has shown, by clear and convincing evidence, that his possession was actual, open, continuous, and exclusive. However, this Court also finds that Mr. DeHertogh has failed to prove his possession was hostile, and that he was acting under claim of right. Accordingly, the Court now addresses these elements and the inherent flaws in Mr. DeHerogh's claim.
 1 Open and Notorious
For a claimant's use to be characterized as open and notorious, the Supreme Court of Rhode Island has stated that "no particular act to establish an intention to claim *Page 12 
ownership is required. It is sufficient if the claimant goes upon the land openly and uses it adversely to the true owner."Carnevale,853 A.2d at 1201 (quoting Gammons, 447 A.2d at 367); seealso Tavares, 814 A.2d at 352; Anthony v. Searle,681 A.2d 892, 897-898 (R.I. 1996). Once the claimant utilizes the land in a manner adverse to the record owner, that owner then "becomes chargeable with knowledge of what is done openly on the land." Tavares, 814 A.2d at 352; Anthony,681 A.2d at 897-98 (citing Gammons, 447 A.2d at 367).
There is no question that the actions taken by Mr. DeHertogh were open to the Beauregards. Mr. DeHertogh did not act discreetly nor did he try and hide his use of the land. Mr. Beauregard acknowledged that Mr. DeHertogh has openly used the land in question. This knowledge, in conjunction with the surveys conducted in 1986 and 2002, evidence that the Beauregards had actual notice regarding Mr. Dehertogh's use of the property in question.
Because Mr. DeHertogh's use was open, the paramount aspect is the notoriety or adversity of the use. The open and notorious elements serve public policy interests by protecting true landowners who have not been put on notice and subsequently prosecute a claim against the trespasser. See Carnevale, 853 A.2d at 1201;see also Tavares, 814 A.2d at 352. If the use is open but not notorious, public policy is not furthered.
The Beauregards do not contend that they were unaware of the activity that occurred on their land. However, the Beauregards do argue that such acts were not adverse or notorious in nature, thus failing to trigger any notice that a claim against the Beauregard Property was being made. When a claimant's initial use is characterized as permissive, the claimant must show some affirmative act that constitutes notice to the *Page 13 
record land owner that the possession is hostile, and that he or she is claiming the property as his or her own. SeeAltieri v. Dolan, 423 A.2d 482, 484 (R.I. 1980);Picerne v. Sylvestre,122 R.I. 85, 92, 404 A.2d 476, 480 (1979); Martineau v.King, 120 R.I. 265, 269, 386 A.2d 1117, 1119-1120 (R.I. 1978). Here, the evidence indicates that Mr. DeHertogh did not take an affirmative act to place the Beauregards on notice that he was making a claim to a portion of the Beauregard Property until the commencement of this action. Thus, while Mr. DeHertogh's use of the land in dispute was certainly open, this Court cannot characterize Mr. DeHertogh's possession as notorious in nature.
 2 Hostile
"Hostility does not connote a communicated emotion, but rather, action inconsistent with the claims of others." Taffinder,119 R.I. at 552, 381 A.2d at 523. "[T]o constitute a hostile use, the adverse possessor need only establish a use `inconsistent with the right of the owner, without permission asked or given.'"Tavares, 814 A.2d at 351 (quoting 16 Powell on RealProperty, § 91.05[1] at 91-23 (2000)).[6] Here, there exist dispositive factors that facilitate a simple analysis in regard to the element of hostility.
As discussed above, because the initial character of Mr. DeHertogh's use was permissive, such use was not adverse to the Beauregards. Until this suit commenced, Mr. Beauregard thought he was merely being amicable by allowing his neighbor to utilize parts of his property for benign uses that were not of consequence to the Beauregards. *Page 14 
Even assuming arguendo that the initial use was not permissive, it has not been shown that Mr. DeHertogh "is holding the property with an intent that is adverse to the interests of the true owner." Tavares, 814 A.2d at 351. To determine if a claimant's intent is adverse to the owner's interest, the "pertinent inquiry centers on the claimant['s] objective manifestations of adverse use." Id. In regard to this inquiry, the Supreme Court of Rhode Island has acknowledged that the "character and locality of the subject land, and the uses and purposes for which it is naturally adopted" should be considered.Id. at 352 (alterations in original omitted). Here, the character and locality of the subject land militate in favor of the Beauregards, as it is not uncommon for rural land owners to allow their neighbors to use their land in a harmless manner.
Notwithstanding this analysis, there is an exception in regard to the eighteen-inch "sliver" of driveway that encroaches upon the Beauregards' land. The Rhode Island Supreme Court has held that the placement of a permanent physical structure, in conjunction with the maintenance of such a structure for the requisite ten years is an act "that is so inconsistent with the true ownership of that property that it is therefore notorious, adverse, hostile, and under claim of right as a matter of law." Reitsma v. PascoagReservoir Dam, LLC, 774 A.2d 826, 835 (R.I. 2001). Thus, this Court finds that the pouring of the permanent asphalt driveway upon the Beauregards' land, coupled with evidence of continuity and exclusivity, entitles Mr. DeHertogh to the eighteen-inch sliver of driveway. *Page 15 
 3 Claim of Right
"[T]o require adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner." Tavares,814 A.2d at 351. Thus, "the entry by the claimant must be in accordance with a claim to the property as the claimant's own with the intent to hold it for the entire statutory period without interruption." Id. (quoting 16 Powell on RealProperty, § 91.05[4], 91-29 (2000)). It is essential that an adverse possessor lay claim to the property as his or her own land.Id. While it is true that a "black-hearted trespasser" can adversely possess land under claim of right, the fact remains that both a "black-hearted trespasser" and a "Good Samaritan" must go upon the land with the purpose of claiming it as his or her own to prosecute a successful claim of adverse possession. SeeTavares, 814 A.2d at 351.
Except for the commencement of this suit in 2002, Mr. DeHertogh has not claimed the land at issue as his own through objective manifestations of adverse use or by any specific affirmative act. Case law is illustrative of the fatal effect on one's adverse possession claim when the adverse possessor does not act under claim of right. See Acompora v. Pearson,899 A.2d 459 (R.I. 2006); Aud-War Realty Co. Inc, v. Ellis,557 A.2d 69 (R.I. 1989). In Acompora, the claimant was awarded the disputed parcel at trial under the doctrine of acquiescence. The Rhode Island Supreme Court affirmed, but held that the appropriate inquiry regarding the two-foot strip of land at issue was that of adverse possession rather than acquiescence. 899 A.2d at 464. TheAcompora court focused on the claimant's concession that she thought her property extended only a *Page 16 
"couple of feet" past the evergreens, and held that she "acted under claim of right only with respect to an area a couple of feet beyond the evergreens." Id. at 467.
Similarly, this Court finds Aud-War Realty to be particularly insightful. There, the Supreme Court of Rhode Island rejected the claim for adverse possession because the claimant was "totally in the dark about the specific location of his easterly boundary." Thus, he was not acting under claim of right and lacked other prerequisites such as adversity and notoriety. SeeAud-War Realty, 557 A.2d at 70.
Here, Mr. DeHertogh's entry into the disputed property was not under claim of right. He merely encroached upon his neighbor's land because he thought his use was inconsequential, a fact to which Mr. Beauregard is in accord. Nonetheless, at some point, Mr. DeHertogh's inconsequential use of portions of the Beauregard Property became personal in nature, and the entire situation was reduced to litigation.
In terms of operation, adverse possession statutes place a heavy burden on the claimant because forfeiture of title is indeed an extreme remedy. It has been stated that title by adverse possession infringes upon one of the most fundamental axioms of the law: "[f]or true it is, that neither fraud nor might can make a title where there wanteth right." Henry W. Ballantine, Title By AdversePossession, 32 Harv. L. Rev. 135 (1918); but cf. T. Draxe Adages 163 (1616) ("Possession is nine points in the law."). Indeed, the Founding Fathers felt so strongly about the protection of property that they placed it amongst life and liberty to be protected by due process of law. See U.S. Const. amend. V ("No person . . . shall be deprived of life, liberty, or property without due process of law . . ."). Thus, it is for good reason that the burden is high, and that courts require strict proof as to each element of an adverse possession claim. *Page 17 
When passing the original version of Rhode Island's adverse possession statute, the General Assembly noted that "skillful men in the law were much wanted" because "many deeds, grants, and conveyances were weakly made, which may occasion great contests in the law if not timely prevented." R.I. Gen. Laws ch. 256 (1909);see also Ballantine supra, at 135 ("[T]he great purpose is automatically to quiet all titles which are openly and consistently asserted, to provide proof of meritorious titles, and correct errors in conveyancing"). This rationale, in addition to the efficient use of land, was pressing in 1909, but is lacking in 2010.
 C Trespass
Having found the Beauregards to be the appropriate owners of each disputed parcel that comprises the DeHertogh Claim (with the exception of the eighteen-inch portion of asphalt driveway), the Court must now review the trespass counterclaims brought against each Plaintiff by the Beauregards. A trespasser is defined as "one who intentionally and without consent or privilege enters another's property." Black's Law Dictionary 1643 (9th
ed. 2009). The Rhode Island Supreme Court has further defined a trespasser as "one who enters upon the property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in performance of any duties to the owner, but merely for his own purpose, pleasure or convenience."Ferreira v. Strack, 652 A.2d 965, 969 (R.I. 1995) (quotingMendoza v. City of Corpus Christi,700 S.W.2d 652, 654 (Tex. Ct.App. 1985)). When no actual damages or injuries are demonstrated by the owner, nominal damages are an appropriate remedy. Smith v. Hart, No. 99-109, 2005 WL 374350 (R.I. Super. Ct. Feb. 7, 2005). *Page 18 
As this Court has found Mr. DeHertogh's use of the disputed property permissive, and as such permission was not rescinded prior to the filing of this suit, no action for trespass against him may stand. Unlike Mr. DeHertogh, who was never ejected from the disputed land, the Faltuses were on several occasions asked to remove their belongings from the Beauregard Property. Indeed, despite his several requests that the Faltuses remove their property from the Disputed Area, Mr. Beauregard nonetheless admits to having extended the time within which they could do so. Based on this testimony, it is clear that although the Faltuses were on notice of the request to remove their objects from the Disputed Area, they had been given permission, at least temporarily, to leave their materials. Based on this extended permission, and the Defendants' inability to show actual injury, this Court denies the Beauregards' counterclaim of trespass against the Faltuses.
 III Conclusion
The Faltuses are unable to establish open and notorious use of the disputed property for the requisite ten-year period, and therefore fail in their claim of adverse possession. Absent the eighteen-inch sliver of driveway, Mr. DeHertogh's claims must likewise fail, as he did not act under claim of right and was unable to clearly and convincingly demonstrate the requisite elements of notoriousness and adversity.
For the aforementioned reasons, this Court enters judgment for the Plaintiff, Mr. DeHertogh as pertaining to his claim for the eighteen-inch sliver of driveway, and for the Defendants as to the remainder of the claims against them. Judgment is ordered in favor of the Faltuses and Mr. DeHertogh on the Defendants' counterclaims for trespass.
[1] Mrs. Cote passed away in 1984.
[2] The slope ascends approximately 20 feet from the "lower plateau" of the Beauregard Property, obstructing the view of the disputed area when standing on the Beauregard Property.
[3] By coincidence, the Beauregards approached the same surveyor who was hired by the Faltuses three years earlier to survey their property.
[4] For example, upon being directed to look at Plaintiff's Exhibit A and subsequently asked if the area between the top of the slope and the property line of the Faltuses' property "had trees on it," Mr. Cote replied, "I don't recall any trees." When asked again, Mr. Cote replied, "not that I recall. Are there now? Are there now?"
[5] Because she was unable to appear at trial, the affidavit of Mrs. Monahan pertaining to her alleged use of the Disputed Area was excluded from this Court's consideration.
[6] A more telling statement describing the requisite nature of hostile possession is found in Professor Powell's introductory material on hostility. There, he states that "[h]ostile possession can be understood as possession that is opposed and antagonistic to all other claims, and that conveys the clear message that the possessor intends to possess the land as his or her own." 16 Powell on RealProperty, § 91.05[1] at 91-23 (2000).